**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR CRIMINAL COMPLAINT**

I, Brian McKay, being duly sworn, hereby depose and state as follows:

1. I am a Special Agent with the Federal Bureau of Investigation ("FBI") currently assigned to the Boston, Massachusetts Field Office. I have been a Special Agent with the FBI for approximately four years, and since joining the FBI, I have been assigned to squads investigating economic crimes including wire fraud, mail fraud and securities fraud.

2. I make this affidavit in support of a criminal complaint charging JEHU HAND with conspiracy to commit securities fraud, in violation of 18 U.S.C. § 371.

3. The facts in this affidavit come from my personal observations and review of records, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended merely to show that there is probable cause for the issuance of a criminal complaint as to HAND and does not set forth all of my knowledge of this matter.

**Background**

4. HAND, 59, is an attorney licensed in California who is believed to reside in Antigua.

5. Greenway Technology ("Greenway") was a publicly traded company whose common stock was publicly quoted under the ticker symbol "GWYT" on the OTC Markets, Inc., an inter-dealer electronic quotation and trading system in the over-the-counter securities market. Incorporated in Nevada, Greenway was a shell company as of at least June 2012, without any active business operations or significant assets.

6. As of June 30, 2012, the vast majority of Greenway's common stock— approximately 20,237,466 of 20,265,802 shares—was restricted and therefore unable to be sold in the public marketplace unless the sales were exempt from the SEC's registration requirements

and the restrictive legends were removed from the stock certificates by the transfer agent. Rule 144 of the Securities Act of 1933 provides the most commonly used exemption for shareholders to sell restricted securities. To take advantage of the Rule 144 exemption, however, the transfer agent generally requires a legal opinion letter stating that the conditions of Rule 144 have been met. One of the conditions of Rule 144 is that the company is not, and has never been, a shell company—which Greenway was as of at least June 2012. Another requirement for reliance on Rule 144 is that restricted stock must be held for at least one year after being acquired from an issuer or an affiliate of an issuer before it can be sold into the market.

## The Scheme to Defraud

7. Beginning in or about May 2012, and continuing through at least February 2013, HAND, along with several other individuals, engaged in a scheme to manipulate the market for Greenway's securities and to sell unregistered shares of the company's stock to the public in connection with a misleading promotional campaign.

8. The scheme that the conspirators engaged in was a pump-and-dump scheme, which typically involves the artificial inflation of the stock price of a publicly traded company (the "pump") so that individuals who control a substantial portion of the company's stock can sell shares of that stock at artificially high prices to other investors (the "dump"). Generally, such schemes effect the artificial inflation by, among other things, issuing news releases and/or promotional materials—often containing false, misleading, or exaggerated information—and/or by engaging in manipulative trading of the stock to raise its price and generate the appearance of demand for the shares.

**Purpose of the Scheme**

9. The purpose of the scheme was for HAND and his co-conspirators to unjustly enrich themselves by obtaining purportedly unrestricted shares of Greenway stock and selling these shares to the public at artificially high prices, which they engineered through false or materially misleading news releases and promotions, and other manipulative conduct, while concealing their control over Greenway and the majority of its stock.

**Manner and Means of the Scheme**

10. HAND and his co-conspirators accomplished their scheme by, among other things, fraudulently obtaining and depositing millions of shares of Greenway stock and then orchestrating the promotion of the company as a promising business venture on the verge of acquiring hotels that would cater to gay and lesbian travelers in several major cities. However, as the conspirators knew, Greenway lacked the means to purchase any such properties, much less to develop upscale resorts as the press releases and promotions claimed.

11. HAND and his co-conspirators further accomplished their scheme by, among other things: (1) using one or more backdated debt assignments to justify the issuance of millions of unrestricted shares of Greenway stock to entities under the control of the conspirators; (2) writing and sending false legal opinion letters to the transfer agent and brokerage firms to facilitate the issuance and deposit of their Greenway stock; and (3) secretly orchestrating the sale of their Greenway shares to the public at inflated prices, which members of the conspiracy had engineered through the issuance of false and materially misleading press releases and promotional alerts.

**Actions Taken in Furtherance of the Scheme**

12. In furtherance of the scheme and to accomplish its objectives, HAND and his co-conspirators committed, and caused to be committed, the following actions, among others, in the District of Massachusetts and elsewhere:

    a. Between approximately May 2012 and June 2012, HAND and his co-conspirators planned the pump and dump of Greenway's stock. According to co-conspirator 1 ("CC-1")[1] and co-conspirator 2 ("CC-2"),[2] HAND engaged in communications with several of his co-conspirators during this time period regarding how to split up Greenway's shares to conceal their control over the vast majority of the company's stock and how to divide the proceeds after they had sold their shares into the market, among other things. Indeed, an e-mail thread dated June 22, 2012, between HAND and two of his co-conspirators set forth the specific

---

[1] CC-1 is a former stock promoter based in Colorado who has engaged in numerous pump-and-dump schemes and has been charged for those activities in the Eastern District of Pennsylvania. CC-1 has entered into a sealed plea agreement with the United States Attorney's Office for the Eastern District of Pennsylvania, and is cooperating with the government in the hopes of obtaining leniency in sentencing. CC-1 has provided law enforcement with information regarding the pump-and-dump of Greenway stock that has been corroborated by additional sources of information and other investigative efforts, including, among other things, electronic mail and consensual recordings.

[2] CC-2 is a former stock promoter based in New Jersey who has engaged in pump-and-dump schemes and has agreed to plead guilty to an Information charging him with conspiracy to commit securities fraud and a substantive count of securities fraud with regard to his participation in the Greenway pump-and-dump scheme, pursuant to a plea agreement with the United States Attorney's Office for the District of Massachusetts. The Information has not, to date, been filed. CC-2 is cooperating with the government in the hopes of obtaining leniency in sentencing. In addition, CC-2 has a criminal history including a two count Information charging CC-2 with willfully failing to file tax returns. CC-2 has agreed to plead guilty to both counts, pursuant to a plea agreement with the United States Attorney's Office for the District of New Jersey. CC-2 has provided law enforcement with information regarding the pump and dump of Greenway stock that has been corroborated by additional sources of information and other investigative efforts, including, among other things, electronic mail and consensual recordings.

4

      percentages of the proceeds that each of them would receive after their Greenway shares were sold during the pump-and-dump scheme.

b. As set forth in paragraph 6 above, the vast majority of Greenway's stock, including millions of shares that the conspirators planned to sell, was restricted and unable to be sold in the market until the restrictive legends were removed by the transfer agent. Accordingly, HAND took several fraudulent steps in order to the remove the restrictive legends and facilitate the deposit of these shares into various different brokerage accounts for trading. For example, in a letter dated July 31, 2012, HAND provided a false legal opinion for the purpose of having the transfer agent remove a restrictive legend from one million shares of Greenway stock issued to Esthetics World, an entity which HAND controlled, according to CC-1. In that letter to Manhattan Transfer Registrar Company, HAND asserted, among other things, that "the Company [Greenway Technology] has never been a shell company." As HAND well knew, however, Greenway had in fact been a shell company. Indeed, according to CC-2, HAND referred to Greenway as a shell during an early conference call, and according to CC-1, HAND once told him that Greenway had a $0.00 balance with $0.00 in liabilities. Further, in a December 26, 2012 e-mail to several of his co-conspirators, HAND referred to Greenway as a shell company no less than four times. Having received HAND's false legal opinion letter, the transfer agent removed the restrictive legend from the one million shares issued to Esthetics World.

c. HAND also drafted and sent false legal opinion letters to brokerage firms to facilitate the deposit of the shares that he had fraudulently convinced the transfer

5

    agent to issue without restrictive legends. For instance, after the transfer agent removed the restrictive legend from the one million shares issued to Esthetics World, HAND wrote a false legal opinion letter on August 22, 2012 to Merrimac Corporate Securities, Inc., to facilitate the deposit of these shares. In this letter, HAND once again falsely stated, among other things, that "the Company [Greenway Technology] has never been a shell company." Having received this letter, the brokerage firm accepted the one million shares for deposit in Esthetics World's account, and these shares were subsequently sold by HAND and his co-conspirators during the pump-and-dump scheme.

d. To further increase the number of shares available to the conspirators to sell during the pump-and-dump scheme, CC-1 stated that HAND created and backdated a partial assignment of a secured promissory note (the "Partial Assignment") that purported to assign $10,000 in debt to an entity called Florence Consulting, LLC ("Florence Consulting"). According to CC-1 and CC-2, and corroborated by e-mail correspondence, Florence Consulting was an entity controlled by Mitchell Brown, a New Jersey-based stock promoter aligned with CC-2 and a participant in the Greenway pump-and-dump scheme.[3] The Partial Assignment falsely purported to have been executed on June 20, 2010, presumably in order to comply with the holding period requirements of Rule 144.

---

[3] Brown has agreed to plead guilty to an Information charging him with conspiracy to commit securities fraud and a substantive count of securities fraud with regard to his participation in the Greenway scheme, pursuant to a plea agreement with the United States Attorney's Office for the District of Massachusetts. That Information has been filed (United States v. Brown, 15-CR-10297-WGY) and a plea hearing has been scheduled for November 23, 2015.

    In actuality, however, both CC-1 and CC-2 have stated that HAND and Brown did not know one another until 2012.  Brown later converted the fraudulent Partial Assignment into 3.5 million shares of Greenway stock, which were deposited in a brokerage account and sold during the pump-and-dump scheme.

e. As with the one million shares of Greenway stock issued to Esthetics World, HAND wrote a false legal opinion letter to facilitate the issuance of the 3.5 million shares of Greenway stock to Florence Consulting without a restrictive legend.  Specifically, in a letter dated July 31, 2012 to Manhattan Transfer Registrar Company, HAND asserted, among other things, that "[i]n reviewing [Greenway's] Disclosure Statement, it appears that Greenway Technology has never been a 'shell' company."  As noted in paragraph 12(b) above, however, HAND knew that Greenway had in fact been a shell company.  As a result of this opinion letter, Florence Consulting and Lara Mac, Inc., another entity controlled by Brown, were issued a total of 7 million free-trading shares of Greenway stock, which were subsequently sold during the pump-and-dump scheme.

f. As agreed to by HAND and his co-conspirators, the co-conspirators engaged in a promotional campaign to generate interest in Greenway stock.  Thus, on various dates in or about and between November 2012 and December 2012, the co-conspirators hired stock promoters to promote Greenway, and on various dates in or about and between November 2012 and December 2012, these stock promoters sent blast e-mails, which reached thousands of recipients, including at least one recipient in Massachusetts, containing misleading information and touting Greenway's stock to potential investors.  For example, one of the blast e-mails

sent on November 19, 2012 stated that Greenway was in negotiations to purchase properties in Palm Springs and Las Vegas and that the deals were "expected to close within the fourth calendar quarter of 2012 or the first calendar quarter of 2013." However, according to CC-1, this was not true and there was not a realistic chance that Greenway would purchase hotels.

g. On various dates between approximately August 2012 and January 2013, HAND and his co-conspirators secretly orchestrated the sales of Greenway shares at artificially high prices which they had engineered through manipulative conduct including the issuance of materially misleading press releases and promotional alerts, thereby causing a loss to the investing public of approximately $855,586. For example, between September 7, 2012 and December 18, 2012, Esthetics World, an entity controlled by HAND as set forth above, sold one million shares of Greenway stock for gross proceeds of approximately $32,811. Moreover, between September 28, 2012 and January 23, 2013, Florence Consulting and Lara Mac, entities controlled by Brown as set forth above, sold 7 million shares of Greenway stock for gross proceeds of approximately $428,916.

**Conclusion**

13. Based on my knowledge, training and experience and the facts set forth in this affidavit, I have probable cause to believe and I do believe that, from in or about and between May 2012 and February 2013, HAND and others known and unknown to the United States Attorney conspired to commit securities fraud in violation of 18 U.S.C. § 371.

Sworn to under the pains and penalties of perjury.

_____
Bryan McKay
Special Agent
Federal Bureau of Investigation


Subscribed and sworn to before me November 10, 2015

_____
The Honorable Page Kelley
United States Magistrate Judge