```
 1              UNITED STATES DISTRICT COURT

 2                DISTRICT OF MASSACHUSETTS

 3                        No. 1:15-cr-10386-WGY

 4

 5    UNITED STATES OF AMERICA

 6

 7    vs.

 8

 9    JEHU HAND

10

11                    *********

12

13                  For Jury Trial Before:
                    Judge William G. Young
14

15

16                  United States District Court
                    District of Massachusetts (Boston.)
17                  One Courthouse Way
                    Boston, Massachusetts 02210
18                  Wednesday, May 16, 2018

19                        ********
20

21
                  REPORTER: RICHARD H. ROMANOW, RPR
22                     Official Court Reporter
                      United States District Court
23         One Courthouse Way, Room 5510, Boston, MA 02210
                       bulldog@richromanow.com
24

25
```

```
1                    A P P E A R A N C E S

2

3    JAMES D. HERBERT, ESQ.
         United States Attorney's Office
4        One Courthouse Way, Suite 9200
         Boston, Massachusetts 02210
5        (617) 748-3100
         E-mail: James.herbert@usdoj.gov
6   and
     ANDREW J. PALID, ESQ.
7      Securities & Exchange Commission - MA
       33 Arch Street, 23rd Floor
8      Boston, Massachusetts 02110-1424
       (617) 573-4540
9      E-mail: Palida@sec.gov
       For the United States of America
10

11   EUGENE G. IREDALE, ESQ.
         Iredale & Yoo, APC, LLP
12       105 West F. Street, 4th Floor
         San Diego, California 92101-9210
13       (619) 233-1525
         Email: Egiredale@iredalelaw.com
14  and
     WILLIAM H. CONNOLLY, ESQ.
15     Law Offices of William H. Connolly
       20 Park Plaza, Suite 1000
16     Boston, Massachusetts 02210
       (617) 542-0200
17     Email: Whc@williamconnollylaw.com
       for the defendant
18

19

20

21

22

23

24

25
```

```
 1                      I N D E X

 2

 3   WITNESS                DIRECT  CROSS  REDIRECT  RECROSS

 4

 5   MARK JAMES DILLON:  (Continued.)

 6      By Mr. Palid:          4                27

 7      By Mr. Iredale:             15

 8

 9   SPECIAL AGENT HEIDI ALONZO

10      By Mr. Herbert:       29

11      By Mr. Iredale:             35

12

13   KIMBERLY PETERSON

14      By Mr. Herbert:       39

15      By Mr. Iredale:            160

16

17

18                   E X H I B I T S

19

20    EXHIBIT 148.................................  87

21    EXHIBIT 616................................. 161

22

23

24

25
```

```
 1                    P R O C E E D I N G S
 2                (Jury enters, 9:00 a.m.)
 3                THE COURT:  Good morning, ladies and
 4      gentlemen, thank you all so very much.  We're all ready.
 5      Let's remind the witness.
 6                THE CLERK:  I'd like to remind you, sir, that
 7      you are still under oath.
 8           Do you understand?
 9                THE WITNESS:  Yes.
10                THE COURT:  And, Mr. Palid.
11                MR. PALID:  Thank you, your Honor.
12
13      DIRECT EXAMINATION BY MR. PALID:  (Continued.)
14      Q.  Good morning, Mr. Dillon.
15      A.  Good morning.
16      Q.  When we left off yesterday we were looking at a
17      document, Exhibit 131.
18                MR. PALID:  Could you pull that back up.
19                (On screen.)
20      A.  (Looks.)  Yes.
21      Q.  And it's dated April 3rd, 2012 from Jehu Hand to
22      your daughter, Ashley Dillon, with a number of
23      attachments.  And when we left off, I was focusing you
24      on a few of those attachments.
25           Towards the bottom it says "Able Direct, check,"
```

1     "Bioclean, check," and "Wilkinson, check."  Do you see

2     that?

3     A.  Yes.

4     Q.  Okay.  And in his e-mail, um, Mr. Hand writes:

5     "Hello, Ashley, here are the documents in response."

6           Do you have an understanding of what that meant?

7     A.  Um, a response to the FINRA deficiency.

8     Q.  What's a "FINRA deficiency"?

9     A.  So when we sponsor a 15C-211, we send it off to the

10    OTC Compliance Unit, and we have an examiner at FINRA

11    that looks at our documents and responds back to us with

12    a -- um, if we were missing documents, um, to where we'd

13    go back and ask the issuer to respond back to us, so we

14    can respond back to FINRA.

15    Q.  Okay.  And then the e-mail goes on:  "Mr. Duque will

16    send you his signed letter, the only problem is that

17    there are three checks, which we do not have a copy,

18    they are Annahuac Management, Esthetics World, and

19    Coolserve, and two of them have ordered copies, but this

20    will take some weeks.  The remaining one, the account

21    has been closed, and they cannot get a copy."

22          Do you see that?

23    A.  I do.

24              MR. PALID:  Can we go to Page 8.

25              (On screen.)

1           THE COURT:  While we're talking about these

2     checks, what did you have to do with these checks?

3           THE WITNESS:  So they would come into our

4     possession and we would send --

5           THE COURT:  Always tell the jury.

6           THE WITNESS:  Oh, sorry.

7        When we would get these checks in -- and in this

8     case it came from Jehu Hand, and then we would

9     basically -- if they had a deficiency, from say 1

10    through 10, um, that that was part of the deficiency, we

11    would put that together and then send it off to FINRA.

12          THE COURT:  So when you say you would get

13    these checks, you would get a copy of it or would you

14    get the original, what would you get?

15          THE WITNESS:  Oh, it would be a copy.

16          THE COURT:  You'd get a copy of it?

17          THE WITNESS:  Yes.

18          THE COURT:  All right.

19    Q.  All right.  So on Page 8, this is one of the

20    attachments to Jehu Hand's e-mail to you, is that right?

21    A.  Yes.

22    Q.  And this check appears to be from a "William H.

23    Wilkinson."  Do you see that?

24    A.  Yes.

25    Q.  Is this how the check appeared when it was e-mailed

1   to Pennaluna?

2   A.  Yes.

3   Q.  Did you alter this check in any way?

4   A.  No.

5            MR. PALID:  Can we turn to --

6   Q.  Did you remove an address beneath William H.

7   Wilkinson's name on this check?

8   A.  No.

9   Q.  Okay.

10            MR. PALID:  Let's turn to Page 9.  Flip it

11   around.

12            (On screen.)

13   Q.  This is another check that was attached to Jehu

14   Hand's e-mail to you and Pennaluna?

15   A.  Yes.

16   Q.  And is this how the check appeared when it was

17   attached to the e-mail?

18   A.  Yes.

19   Q.  And did you alter this check in any way?

20   A.  No.

21   Q.  Did you change the, um, name above the signature

22   line?

23   A.  No.

24   Q.  Okay.

25            MR. PALID:  Can we go to Page 26.

1              (On screen.)

2    Q.   Is this another check that was attached to Jehu

3    Hand's e-mail to Pennaluna?

4    A.   Yes.

5    Q.   And again did you alter this check in any way?

6    A.   No.

7    Q.   Did you change the name above the signature line?

8    A.   No.

9    Q.   Okay.

10              MR. PALID:   Can we pull up Exhibit 128.

11              (On screen.)

12   Q.   Do you recognize this document, Mr. Dillon?

13   A.   Yes.

14   Q.   What is it?

15   A.   It's a response to the FINRA examiner, um,

16   responding back to a deficiency.

17   Q.   Okay, and you write, "This response to your letter

18   of March 29th, 2012 concerning the above submission."

19        What March 29th, 2012 letter were you referring

20   to?

21   A.   It would have been a letter from FINRA.

22   Q.   Okay.

23              MR. PALID:   Can we turn to Page 2.

24              (On screen.)

25   Q.   Is this the letter that you were responding to?

1    A.   Yes, correct.

2    Q.   Okay.   And when you got deficiency letters from

3    FINRA regarding Crown, who did you reach out to?

4    A.   Jehu Hand.

5    Q.   Do you recall ever reaching out to Carlos Duque?

6    A.   Not that I know of.

7    Q.   Okay.   And why would you reach out to Jehu Hand?

8    A.   He's a securities attorney for the company.

9    Q.   And did you have a preexisting relationship with

10   Mr. Hand?

11   A.   I've known Jehu for quite a while.

12   Q.   Okay.

13            MR. PALID:   Let's turn to Page 3, and let's

14   blow up Item Number 7.

15            (On screen.)

16   Q.   Now, in Item Number 7 it says:   "The copies of the

17   executed subscription agreements and the checks provided

18   with your Form 211 application appear to be incomplete.

19   Provide the executed checks for the following

20   shareholders, William Wilkinson, Bioclean Products, Able

21   Direct Marketing, Coolserve Corporation, Annahuac

22   Management, and Esthetics World."

23        Do you see that?

24   A.   Yes.

25   Q.   What did you understand FINRA to be asking for?

1    A.   They wanted to see those checks.

2    Q.   Okay.  And did you in fact send some of those checks

3    to FINRA under cover of this letter?

4    A.   Yes.

5    Q.   And where did you get the checks that you sent to

6    FINRA?

7    A.   Jehu Hand.

8    Q.   Okay.

9             MR. PALID:  Let's turn to Page 21.

10            (On screen.)

11   Q.   Is this one of the checks that you sent to FINRA

12   under cover of your letter?

13   A.   Yes.

14   Q.   And is this a check that you got from Jehu Hand?

15   A.   Yes.

16   Q.   Did you alter this check in any way?

17   A.   No.

18   Q.   Okay.

19            MR. PALID:  Page 22.  Flip it around.

20            (On screen.)

21   Q.   This is another check that you sent to FINRA?

22   A.   Yes.

23   Q.   And where did you get this check?

24   A.   Jehu Hand.

25   Q.   Okay.  Did you alter this check in any way?

1    A.   No.

2                MR. PALID:   Page 23.

3                (On screen.)

4    Q.   Is this another check that you sent to FINRA?

5    A.   Yes.

6    Q.   Where did you get this check?

7    A.   Jehu Hand.

8    Q.   Did you alter this check in any way?

9    A.   No.

10   Q.   And these three checks that we just looked at, are

11   these the same as the checks that we just saw in the

12   e-mail from Jehu Hand to Pennaluna?

13   A.   Yes.

14   Q.   Okay.

15               MR. PALID:   Let's go to Exhibit 132.

16               (On screen.)

17   Q.   What is this?

18   A.   It's a cover sheet going to the OTC Compliance Unit

19   at FINRA.

20               MR. PALID:   Now turn to Page 2.

21               (On screen.)

22   Q.   On Page 2 you write, "Dear, Mr. Mayes, this responds

23   to your letter of April 18th, 2012 concerning the above

24   submission."

25        What were you referring to there, the letter of

1    April 18th, 2012?

2    A.   (Silence.)

3             MR. PALID:   Could we blow up the section for

4    Mr. Dillon.

5             (Enlarged.)

6    A.   So they're basically asking us about another

7    deficiency and we're responding back.

8    Q.   Okay, so there was another FINRA deficiency letter

9    and you are guys are responding to it?

10   A.   Yes.

11   Q.   All right.

12            MR. PALID:   Turn to Page 3.

13            (On screen.)

14   Q.   Is this that April 18th, 2012 FINRA deficiency

15   letter that you're now responding to?

16   A.   Yes.

17   Q.   Okay.  All right.

18            MR. PALID:   Can we blow up Item Number 1.

19            (On screen.)

20   Q.   "Item Number 1:  The staff reviewed your response to

21   Comment 7 of our March 29th, 2012 letter.  Please

22   provide the executed checks for the follow remaining

23   shareholders, Coolserve Corporation, Annahuac

24   Management, and Esthetics World."

25        Do you see that?

1    A.   Yes.

2    Q.   And again when you got deficiency letters from

3    FINRA, who did you reach out to?

4    A.   Jehu Hand.

5            MR. PALID:   Now let's turn to Page, um, 5.

6            (On screen.)

7    Q.   Do you see this letter from Carlos Duque?

8    A.   I do.

9    Q.   Okay.  And in the letter from Carlos Duque, he

10   writes:  "Dear, Mr. Dillon, I respond on behalf of and

11   as counsel for Crown Marketing with respect to FINRA's

12   letter, dated March 18th, 2012, the three missing checks

13   are provided."

14       Do you see that?

15   A.   I do.

16   Q.   Okay.

17           MR. PALID:   Let's go to Page 6.

18           (On screen.)

19   Q.   Is this one of those missing checks that was sent to

20   FINRA?

21   A.   That is correct.

22   Q.   Did you alter this check in any way?

23   A.   No.

24   Q.   Do you know where you got this check from?

25   A.   Either from Carlos or Jehu Hand.

```
 1    Q.  Do you recall which?
 2    A.  No.
 3    Q.  Okay.
 4              MR. PALID:  Page 7.
 5              (On screen.)
 6    Q.  Is this another one of those checks that was sent to
 7    FINRA?
 8    A.  Yes.
 9    Q.  Did you alter this check in any way?
10    A.  No.
11    Q.  Do you know who you got this check from?
12    A.  Either Carlos or Jehu again.
13    Q.  Okay.
14              MR. PALID:  Page 8.
15              (On screen.)
16    Q.  Is this another check that was sent to FINRA?
17    A.  Yes.
18    Q.  Did you alter this check in any way?
19    A.  No.
20    Q.  Do you know where you got this check from?
21    A.  Either Jehu Hand or Carlos.
22    Q.  Okay.  And would you have sent any checks to FINRA
23    if you had known that they had been altered?
24    A.  No.
25    Q.  What would you have done?
```

1  A.   Um, cancelled the deficiency -- I mean, sorry,
2  cancelled the 211.
3  Q.   Cancelled the 211?
4  A.   Yeah.
5  Q.   Okay.  And what would the result of canceling the
6  211 be?
7  A.   You wouldn't have gotten a trading symbol.
8  Q.   So that Crown Marketing wouldn't have been able to
9  trade?
10  A.   No.
11  Q.   All right.
12           MR. PALID:  Just a moment.
13           (Pause.)
14           MR. PALID:  No further questions, your Honor.
15           THE COURT:  Any questions from this witness?
16           MR. IREDALE:  Yes, your Honor.
17           THE COURT:  You may.
18
19  CROSS-EXAMINATION BY MR. IREDALE:
20  Q.   Good morning, Mr. Dillon.
21  A.   Good morning.
22  Q.   You have known Jehu from about 1990?
23  A.   That is correct.
24  Q.   You've had dealings with him over the years?
25  A.   Yes, sir.

1    Q.   I think you met him once in person?

2    A.   That's correct.

3    Q.   And you've never had any problems or issues with

4    him, correct?

5    A.   Correct.

6    Q.   All right.  The dealings that you've had with him

7    have been above-board and straightforward?

8    A.   They've been fine.

9    Q.   And now you were asked some questions about certain

10   documents.

11              MR. IREDALE:  Let me, if I could, ask you to

12   go -- or if we could go back to Exhibit 131.  (On

13   screen.)  And could we look at the top.  (On screen.)

14   Q.   Your daughter, Ashley, I believe was working at

15   Pennaluna at the time?

16   A.   That's correct.

17   Q.   And did she also do some work in connection with the

18   211?

19   A.   She helped process the paperwork on 211s to me.

20   Q.   Now did you yourself review these materials after

21   they came in?

22   A.   I did.  She sat next to me, so I did see them.

23   Q.   Now as to the address, it says "From Jehu Hand at

24   Jehuhand@yahoo.com."  Do you see that?

25   A.   Yes.

1    Q.  Now in this regard you had no specific oral

2    communications with Mr. Hand, correct, in other words

3    you received an e-mail?

4    A.  Yeah, I can't recall, um, if I talked to anyone.

5    Q.  Well do you know if this was set by him or by his

6    secretary on his behalf?

7    A.  I don't know.

8    Q.  You don't know?

9    A.  No.

10   Q.  Okay.

11          MR. IREDALE:  Let me -- if we could go to

12   Bates 807 in the same exhibit, 131.

13          (On screen.)

14   Q.  This is one of the checks, I believe, that was

15   attached to Exhibit 131?

16   A.  Okay.

17   Q.  Do you recall that?

18   A.  I'd have to look back at 131.

19   Q.  All right.

20          MR. IREDALE:  May I approach the witness,

21   please, your Honor?

22          THE COURT:  You may.

23   Q.  Let me show you a paper copy, it will be quicker.

24   A.  (Looks.)  Okay.

25   Q.  All right.  And that is --

1          MR. IREDALE:  And could we display that?  (On

2     screen.)  Yes.

3     Q.  That's a check for Randall Peterson and Kimberly

4     Peterson and you see it has an address on it, "24 Calle

5     de la Luna, San Clemente, California"?

6     A.  Yes.

7     Q.  In the amount of $100?

8     A.  Yes.

9     Q.  Do you remember this check also as coming with that

10    e-mail?

11    A.  It was an e-mail, that it came with the e-mail.

12    Q.  All right.  In other words you receive hundreds of

13    e-mails in any given month, would that be fair to say?

14    A.  Um, quite a few e-mails, yes.

15    Q.  You have no specific recollection of this, you're

16    going off the records that you were shown?

17    A.  That's correct.

18          MR. IREDALE:  Let's go, if we could, to Bates

19    809, please.

20          (On screen.)

21    Q.  Do you see the address on that check, it appears to

22    be "24 Calle de la Luna," it says "SC California" with a

23    zip?

24    A.  Yes.

25    Q.  "Calle de la Luna" is the same as the address we saw

1    in the last check?

2    A.  Yes.

3              MR. IREDALE:  Could we go to Exhibit 810 --

4    I'm sorry, Bates 810, the same exhibit.

5              (On screen.)

6              MR. IREDALE:  Could we blow up the first

7    one-third of the document showing the names of the

8    sender and of the receiver of the correspondence.

9              (Enlarged.)

10   Q.  This is a letter from Carlos Duque to you at

11   Pennaluna, is that fair to say?

12   A.  Yes.

13   Q.  Mr. Duque was the person who provided the

14   information attached to the letter?  If you know.

15   A.  I would be going off of paperwork that I'm seeing

16   here.

17   Q.  All right.  In other words these events happened in

18   2012, you're asked to come into court six years later

19   and testify about a paper at a particular time and you

20   received -- is it fair to say that in your career you

21   have literally touched a ton of paper?

22   A.  I have.

23   Q.  And you're shown documents and you're doing the best

24   that you can to explain what you remember?

25   A.  Correct.

1   Q.  Is that fair to say?

2   A.  Correct.

3   Q.  All right.

4           MR. IREDALE:  Now I'd like to go to Exhibit

5   152.

6           (On screen.)

7   Q.  Now the way the 211 process goes, as I understand

8   it, is that you, as the broker/dealer, make the

9   application to FINRA on behalf of the issuer?

10  A.  Yes.

11  Q.  And in that regard FINRA is supposed to do due

12  diligence in looking at the information, making sure

13  that everything is in line, and asking for additional

14  information, is that fair?

15  A.  Correct, yes.

16  Q.  And in this case there were several back and forths

17  between you and between FINRA in which they said "Well,

18  we want to find this" or "We wouldn't know this" or

19  "Tell us some more information," is that fair to say?

20  A.  That's correct.

21  Q.  And that's typical for the process?

22  A.  Correct.

23  Q.  Nothing unusual about that, this was a typical 211?

24  A.  Correct.

25          MR. IREDALE:  In Exhibit 152, I'd like to go

1  to Bates Page 855, please.

2          (On screen.)

3  Q.  This is a letter to you from Carlos Duque, is that

4  correct?

5  A.  Correct.

6  Q.  And Carlos Duque, you understood, was the attorney

7  for the corporation, Crown?

8  A.  This shows that on the document.

9  Q.  Do you recall receiving this correspondence from

10 Mr. Duque?

11 A.  I don't recall, but it has my name on it, so

12 obviously I did.

13 Q.  Okay.

14         MR. IREDALE:  Could we go now to Bates 861.

15         (On screen.)

16 Q.  This is a letter to Eric Mayes from you providing

17 the additional information that you had received from

18 Mr. Duque, correct?

19 A.  Correct.

20         MR. IREDALE:  Now I'd like to go to 862, the

21 same exhibit.

22         (On screen.)

23 Q.  This is a letter from Carlos Duque to you, do you

24 see?

25 A.  Yes.

1    Q.  It says "Via mail only," so it would have been

2    received by mail, if you recall?

3    A.  I don't have a recollection.  None.  It's 2012.

4    Q.  The document itself says, in Section (b), Paragraph

5    4, "Kimberly Peterson is the corporate secretary, she

6    owns 1,000 shares and is the wife of Randall Peterson

7    and the mother of Taylor Peterson.  Scott Roberts is her

8    brother and Christie Roberts is her sister.  Mary

9    Solotsky is her mother and Richard Solotsky is her

10   father.  Vicky Foster is a friend of hers.  Each of

11   these persons owns 1,000 shares."

12        Did I read that right?

13   A.  That's correct, yes.

14   Q.  And then Paragraph 8 notes that Jehu Hand was, from

15   2008 to 2011, the corporate secretary, he owns 24 shares

16   via his ownership of Ideogram Corporation, and 20,150

17   shares directly. "

18        Did I read that properly?

19   A.  Yes.

20        MR. IREDALE:  Could we go to Page 2, Paragraph

21   7.  Could we enlarge that.

22        (Enlarged.)

23   Q.  Mr. Duque writes in his letter:  "I enclose the

24   requested documents for Bioclean, Able, and Wilkinson.

25   Of the three remaining checks, the shareholders have

1    ordered copies from the bank.  On the third missing

2    check, the account is closed and we do not think we can

3    get a copy."  And then you see at the bottom it's signed

4    "Very truly yours, Carlos Duque, Esq."?

5    A.  Yes.

6    Q.  Okay.

7              MR. IREDALE:  Now I'm wondering if we could go

8    to Bates, Page 894, the same exhibit.

9              (On screen.)

10   Q.  This is a letter addressed to you and it's from

11   Carlos Duque.  Do you see that?

12   A.  Yes.

13   Q.  "Dear, Mr. Dillon, I respond on behalf of and as

14   counsel for Crown Marketing with respect to FINRA's

15   letter dated March April 18th, 2012."  Let me stop right

16   there.

17        As far as you know there's no existing month

18   called "March April," it's either March or April?

19   A.  Yes.

20   Q.  And he says thereafter "(1) the three missing checks

21   are provided."

22   A.  (Silence.)

23              MR. IREDALE:  Could we go to the next page,

24   895.

25              (On screen.)

1    Q.   One of those checks attached to Mr. Duque's letter

2    is this document?

3    A.   Yes.

4              MR. IREDALE:   Could we go to 896, please.

5              (On screen.)

6    Q.   The second check attached is this document showing a

7    check from "Hand & Hand, a professional corporation"?

8    A.   Yes.

9    Q.   And the memo section says "Coolserve"?

10   A.   Yes.

11             MR. IREDALE:   And then finally, the third

12   check attached to Mr. Duque's letter to you is on Page

13   897.

14             (On screen.)

15   Q.   And it is for Esthetics World.   Do you see that?

16   A.   Yes.

17   Q.   And then you, for your part, having received these

18   documents from Mr. Duque, forwarded them to FINRA in

19   answer to a request for additional information they had

20   made to you?

21   A.   Yes.

22             MR. IREDALE:   Could we go to Page 916 of

23   Exhibit 152, please.

24             (On screen.)

25   Q.   This is another letter from Mr. Duque to you?

1    A.   Yes.

2    Q.   This one says "via e-mail" at the top?

3    A.   Yes.

4    Q.   And then Mr. Duque writes:   "As requested by the

5    staff of the OTC Compliance Unit, the March 31, 2012 10Q

6    has been amended to check the 'Yes' box on the facing

7    page with respect to shell status."

8          Did I read it properly?

9    A.   Yes.

10   Q.   And let me talk to you about "shells" for one

11   moment.

12         "Shell" is a term of art in your business?

13   A.   Um, repeat that please?

14   Q.   Yes, "Shell."

15   A.   That's correct.

16   Q.   You've heard that word before?

17   A.   Yes, that's correct.

18   Q.   And it's a term that has both a general meaning to

19   the general public and a specific meaning in the world

20   of stocks and bonds?

21   A.   That's correct.

22   Q.   So that if we were to say "shell," generally if I

23   said to you "Hey, that company's just a 'shell'," it

24   would mean it's not a good company, it doesn't have a

25   lot of assets, et cetera?

1   A.   Correct.

2   Q.   In common parlance, if we're just speaking people

3   one to one, but in your world "shell" means a specific

4   thing, it means a company that does not have ongoing

5   operations, more than nominal assets, or more than

6   nominal income, is that fair to say?

7   A.   That's correct.

8   Q.   So it has a very specific legal meaning?

9   A.   Yes.

10   Q.   So that if I'm speaking generally and I say "shell,"

11   it may mean one thing, but in this particular world of

12   finance it has a specific legal meaning?

13   A.   Yes.

14   Q.   So, for instance, there are things that are called

15   "shells" and there are things that are called "nonshell

16   shell," have you heard that phrase?

17   A.   That's one way to term it.

18   Q.   In other words it's a company that's just starting

19   or it's a company without a lot of assets, but it has

20   enough assets so that it's more than nominal and

21   therefore not legally technically a "shell"?

22   A.   That's correct.

23   Q.   And, Mr. Dillon, you have given us your best

24   testimony, as best you can remember, about something

25   that happened six years ago?

1    A.   Yes.

2    Q.   Thank you so much.

3              MR. IREDALE:   That's all I have.

4              THE COURT:   Nothing further for this witness?

5              MR. PALID:   Very briefly, your Honor.

6              THE COURT:   Okay, go ahead.

7

8    REDIRECT EXAMINATION BY MR. PALID:

9              MR. PALID:   Mr. Dillon, returning to Exhibit

10   131.

11             (On screen.)

12   Q.   The e-mail from Jehu Hand, um, attaching those three

13   checks, Able Direct, Bioclean, and Wilkinson.   What's

14   the date on that e-mail?

15   A.   April 3rd, 2012.

16   Q.   Okay.

17             MR. PALID:   Now can we go to Exhibit 152.

18             (On screen.)

19             MR. PALID:   And can we go to Page 862, um,

20   Bates 862, which is probably about 19 pages in.

21             (On screen.)

22   Q.   And what's the date on this letter from Carlos

23   Duque?

24   A.   April 5th, 2012.

25   Q.   So two days later?

```
1    A.   Two days later.
2    Q.   And it says it was provided "via e-mail only,"
3    right, not mail, but e-mail?
4    A.   It does say "e-mail only."
5    Q.   Okay.  And, Mr. Dillon, just to be clear, do you
6    ever recall actually receiving any checks from Carlos
7    Duque?
8    A.   I don't recall.
9    Q.   Okay.  And, Mr. Dillon, was it your job to determine
10   whether or not a company was a "shell" or not?
11   A.   No.
12   Q.   Okay.
13              MR. PALID:  Nothing further.
14              THE COURT:  Nothing further for this witness?
15              MR. IREDALE:  No, your Honor.
16              THE COURT:  You may step down.  Thank you.
17              (Witness steps down.)
18              THE COURT:  Call your next witness.
19              MR. HERBERT:  Heidi Alonzo, your Honor.
20              (SPECIAL AGENT HEIDI ALONZO, sworn.)
21
22              *************************
23              SPECIAL AGENT HEIDI ALONZO
24              *************************
25
```

1    DIRECT EXAMINATION BY MR. HERBERT:

2    Q.  Good morning.  Would you state your full name and

3    spell your last name for the record, please.

4    A.  Heidi Alonzo, A-L-O-N-Z-O.

5    Q.  Where do you work, Ms. Alonzo?

6    A.  For the FBI.

7    Q.  And what's your title there?

8    A.  I'm a Special Agent.

9    Q.  Okay, and how long have you been a Special Agent

10   with the FBI?

11   A.  It's been 21 years.

12   Q.  Okay.  Which field office are you assigned to?

13   A.  The Los Angeles division.

14   Q.  Okay.  And is that where you were assigned in 2015?

15   A.  Yes.

16   Q.  And which squad are you assigned to?

17   A.  I'm on the white-color squad and I'm actually in a

18   resident agency in Orange County, California.

19   Q.  And by "white-color squad," are you referring to

20   white-collar crime?

21   A.  Yes.

22   Q.  What if any jurisdiction does the FBI have over the

23   investigation of criminal securities fraud offenses?

24   A.  Um, we have primary jurisdiction over those

25   offenses.

1  Q.  And what does "primary jurisdiction" mean?

2  A.  Um, we're the lead agency that investigates those

3  crimes.

4  Q.  Okay.  And what if any jurisdiction does the FBI

5  have over the investigation of wire fraud offenses?

6  A.  It's the same, primary.

7  Q.  And what if any jurisdiction does the FBI have over

8  the investigation of conspiracy to commit wire fraud and

9  securities fraud?

10  A.  The same.

11  Q.  All right.

12       Now, have you heard of an individual named

13  "Kimberly Peterson"?

14  A.  Yes.

15  Q.  And how did you first hear that name?

16  A.  Um, so when I was working on my white color squad, I

17  had another agent in my squad who asked me to help him

18  on a lead he had gotten from Boston and that means

19  basically he was requested by an agent here in Boston to

20  go out to Kimberly Peterson and serve her with a

21  subpoena and interview her.

22  Q.  I'm sorry, I didn't hear the last part, serve her

23  with a subpoena and what?

24  A.  And interview her.

25  Q.  Okay.  And what type of subpoena was that?

1    A.   It was a federal grand jury subpoena to testify and

2    produce documents.

3    Q.   Okay.  And which agent asked you to accompany him to

4    serve the subpoena?

5    A.   His name is Johanness Vandenhogan.

6    Q.   And when were you asked to help serve that subpoena?

7    A.   So this was in December of 2015 and, um, he asked me

8    probably like a day or two before we actually went out

9    and did it.

10   Q.   Okay, and what steps did you take to serve that

11   subpoena?

12   A.   So he gave me the address where she resided and, um,

13   I went out there and, um, I actually got to the address

14   before he did, and I noticed that Ms. Peterson was

15   leaving her house, she was getting in her car to leave,

16   so I approached her and identified myself and asked her

17   if she would wait a few minutes so we could wait for the

18   other agent to arrive.

19   Q.   Okay.  How did you identify yourself?

20   A.   I told her my name, I said I was a Special Agent

21   with the FBI, and I showed her my credentials.

22   Q.   Okay.  And what was the address you went to?

23   A.   It was, um, 24, I believe, Calle de la Luna in San

24   Clemente, California.

25   Q.   All right.  And what was the date on which you went

1    to Ms. Peterson's house to serve the subpoena?

2    A.   It was December 11th, 2015.

3    Q.   Okay.

4              MR. HERBERT:   Could we have Exhibit 142,

5    please.

6              (On screen.)

7    Q.   Do you recognize what's on the screen before you as

8    Exhibit 142?

9    A.   Yes.

10   Q.   What do you recognize that to be?

11   A.   So that's the federal grand jury subpoena that

12   Ms. Peterson was served with.

13   Q.   All right.   Okay.   And what is the date on which

14   Ms. Peterson was commanded to appear before the grand

15   jury?

16   A.   That was December 2nd, 2015.

17   Q.   And do you know whether there had been any previous

18   efforts to locate Ms. Peterson?

19   A.   Um, I believe the other agents had told me he had

20   done something to locate her, I don't really recall what

21   the circumstances were.

22   Q.   Okay.   So did Special Agent Vandenhogan arrive after

23   you?

24   A.   Yes.

25   Q.   After you get there?

1    A.   Yes.

2    Q.   And how did he identify himself to Ms. Peterson?

3    A.   So he introduced himself with his name, Special

4    Agent of the FBI, and showed his credentials.

5    Q.   All right.  Did you tell Ms. Peterson why you were

6    there?

7    A.   So I didn't have a lot of details because the other

8    agent had just asked me to accompany him, I didn't

9    really know what we were going to be doing, so I just

10   told her initially that we needed to interview her, um,

11   and asked her to wait for the other agent, and then when

12   he arrived, he knew a little more about it and he said

13   it was regarding Jehu Hand.

14   Q.   Okay.  And did you in fact conduct an interview of

15   Ms. Peterson on that day?

16   A.   Yes.

17   Q.   Okay.  And just in general do you recall the topics,

18   um, what or whom you asked her about?

19   A.   So I only asked her about, um, how she knew of him,

20   what her relationship was with him, and then we got into

21   her telling us about, um, some bank accounts that she

22   had opened for him and some companies that she was

23   involved with.

24   Q.   Okay, and did she answer your questions for a time?

25   A.   Yes.

1   Q.   And do you recall how that interview ended?

2              MR. IREDALE:   Objection, relevance, hearsay,

3   403.

4              THE COURT:   Sustained.

5              MR. HERBERT:   Okay.

6   Q.   And what did you and, um, Special Agent Vandenhogan

7   do after the interview stopped?

8   A.   So once we ceased the interview, we presented her

9   with the federal grand jury subpoena and told her that

10  she needed to, um, contact the Special Agent that was

11  listed on the subpoena to get another date, um, find out

12  what dates she would be asked to appear.

13  Q.   Okay, and why did you add that?

14  A.   Because the date listed on the subpoena was December

15  2nd and that day had already passed because we were

16  talking to her on December 11th.

17  Q.   Okay, and did she indicate that she understood that?

18  A.   Yes.

19             MR. HERBERT:   Could I just have a moment, your

20  Honor?

21             (Pause.)

22             MR. HERBERT:   No further questions.

23             THE COURT:   Anything?

24             MR. IREDALE:   Just very briefly, your Honor.

25         Could we go to the exhibit about which the witness

1     testified, I believe it's 142.  Could we enlarge the top

2     part.

3                    (Enlarged.)

4

5     CROSS-EXAMINATION BY MR. IREDALE:

6     Q.   Special Agent Alonzo, as I understand it, you were

7     the person who served this subpoena?

8     A.   The other agent and I did it together, yeah.

9     Q.   Who gave it to Ms. Peterson, was it you, from your

10    hand, or was it from Johannes Vandenhogan?

11    A.   Um, probably from his hand because he was the lead

12    agent on the, um -- on the lead.  But we were both there

13    together.

14    Q.   Now this subpoena is a subpoena to testify before

15    the grand jury, is that correct?

16    A.   Yes.

17    Q.   It says:  "You are commanded to appear in this

18    United States District Court at the time, date, and

19    place shown below to testify before the Court's grand

20    jury.  When you arrive you must remain in the court

21    until the judge or a court officer allows you to leave."

22             The place is given as the grand jury room on the

23    10th floor of this courthouse, is that true?

24    A.   Yes.

25    Q.   And the date and time says "12-2-2015" at

1    "10:00 a.m.", right?

2    A.  Yes.

3    Q.  You served this subpoena, this order for

4    Ms. Peterson to appear at the grand jury room in this

5    courthouse, 9 days after the date on which she was

6    ordered to appear, correct?

7    A.  That's correct.

8    Q.  And she said, in essence, to you, "How can I appear

9    on the 2nd of December when it's now the 11th of

10   December?" right, do you remember her saying that or

11   words to that effect?

12   A.  No, I don't think it was quite that dramatic, it was

13   more of, "Well what date shall I appear then?"

14   Q.  Did she say, "Is this subpoena still good?" and was

15   she told by Vandenhogan, "Yes, you're required to obey

16   this subpoena and contact the agent"?

17   A.  "You're required to contact the agent and the

18   subpoena is still in effect."

19   Q.  Well now the subpoena was served and the subpoena's

20   date had already passed, correct?

21   A.  Correct.

22   Q.  A subpoena, you understand, is an order from the

23   court?

24   A.  Is that a question?

25   Q.  Yes.

1    A.  Yes.

2    Q.  All right.

3            MR. IREDALE:  Could we look at the rest of the

4    subpoena.

5            (On screen.)

6    Q.  This says:  "This request is for testimony and

7    documents, see Attachment A."

8        Did you give an Attachment A, or Vandenhogan, in

9    your presence?

10   A.  I'm sure there was an attachment attached to it.

11           MR. IREDALE:  Could we see if there's a second

12   page to this document.

13           (On screen.)

14   Q.  And this is called the "Proof of Service," it's

15   supposed to be filled out by the person who serves the

16   document, is that true?

17   A.  Yes.

18   Q.  Did you fill out the proof of service?

19   A.  No.

20   Q.  Did Ms. -- did Special Agent Vandenhogan fill out

21   the proof of service?

22   A.  Yes.

23   Q.  Somewhere there's a filled-out proof of service?

24   A.  Correct.

25   Q.  Now, can you tell me where on the document it says

1    that the witness served is required by the subpoena to

2    contact the FBI agent?

3    A.   Well she was advised that verbally, it's not

4    something that's printed on the subpoena.

5    Q.   Well it's not a legal requirement that is imposed by

6    the subpoena at all, is it?

7                 THE COURT:   Come to the sidebar.

8

9                 AT THE SIDEBAR

10                THE COURT:   What's the point of this?

11                MR. IREDALE:   Just that they were overreaching

12   by telling the witness that she had to contact the FBI.

13                THE COURT:   It has nothing to do with this

14   case.   Move on.

15                MR. IREDALE:   Yes, your Honor.

16

17                (In open court.)

18                MR. IREDALE:   Can we go to the first page.

19                (Enlarged.)

20   Q.   Is there a name of the FBI agent on the subpoena

21   itself?

22                MR. HERBERT:   Objection.

23                THE COURT:   Sustained, the document speaks for

24   itself.   We're assuming the jury can read.   Let's move

25   on.

1              MR. IREDALE:  Given that, your Honor, I have
2    no further questions.
3              THE COURT:  Fine.  The document's in evidence.
4        Nothing further for this witness?
5              MR. HERBERT:  No, your Honor.
6              THE COURT:  You may step down.  Thank you.
7              THE WITNESS:  Thank you.
8              (Witness steps down.)
9              THE COURT:  Call your next witness.
10             MR. HERBERT:  Kim Peterson, your Honor.
11             THE COURT:  She may be called.
12             (KIMBERLY PETERSON, sworn.)
13
14             * * * * * * * * * * * * * * * * *
15             KIMBERLY PETERSON
16             * * * * * * * * * * * * * * * * *
17
18   DIRECT EXAMINATION BY MR. HERBERT:
19   Q.  Good morning.  Could you state your full name and
20   spell your last name for the record, please.
21   A.  Mary Kimberly Peterson, P-E-T-E-R-S-O-N.
22   Q.  Okay.  What city and state do you live in,
23   Ms. Peterson?
24   A.  San Clemente, California.
25   Q.  Okay.

1          MR. HERBERT:  And can I just ask you to try to

2   keep your voice up or pull the microphone in as much as

3   you can just so that everyone can hear you.

4          THE COURT:  And you be comfortable in that

5   seat there, but that mic moves, and so feel free to

6   adjust it.  And it works best if it's in front of your

7   mouth.

8          THE WITNESS:  Yes.  Okay.

9          THE COURT:  Now go right ahead.

10          MR. HERBERT:  Thank you, your Honor.

11   Q.  Ms. Peterson, do you know an individual named Jehu

12   Hand?

13   A.  Yes.

14   Q.  How do you know him?

15   A.  Um, I worked for him for many years.

16   Q.  Okay.  How long did you work for him?

17   A.  Approximately 25 years.

18   Q.  Okay.  Could you look around the courtroom and tell

19   us if you see him?

20   A.  Yes, right there.  (Indicates.)

21   Q.  And could you point him out and describe an article

22   of clothing he's wearing?

23   A.  He's wearing a gray blazer.

24   Q.  Okay.

25          MR. HERBERT:  May the record reflect that

1  she's identified the defendant, your Honor?

2            THE COURT:  It may.

3            MR. HERBERT:  All right.

4  Q.  Ms. Peterson, are you testifying today under an

5  agreement with the U.S. Attorney's Office?

6  A.  Yes.

7            MR. HERBERT:  Could we have Exhibit 111,

8  please.

9            (On screen.)

10 Q.  Do you recognize this document?

11 A.  Yes.

12           MR. HERBERT:  Okay, could we go to the second

13 page of it, please.

14           (On screen.)

15 Q.  And is that your signature at the end?

16 A.  Yes.

17 Q.  Okay.

18           MR. HERBERT:  And if we could just go back to

19 Page 1 for a second, um, Paragraph 1.

20           (On screen.)

21 Q.  What do you understand this agreement to require of

22 you?

23 A.  Um, to answer truthfully any questions that are

24 asked, um, and it can't be held against me.

25 Q.  All right, so that's the second question I was going

1    to ask.  So what's your understanding as to what you get

2    out of this?

3    A.   Um, it won't be held against me.

4    Q.   Okay.  All right.  So your testimony will not be

5    used against you, is that your understanding of it?

6    A.   Yes, correct.

7    Q.   All right.  Could you tell us about your educational

8    background, please.

9    A.   Um, I completed high school with a GED, and I took a

10   couple classes at Orange Coast College.

11   Q.   Okay.  Is that a community college?

12   A.   Yes, it is.

13   Q.   Okay.  And how old were you when you started working

14   full-time?

15   A.   17.

16   Q.   And what did you start out doing?

17   A.   Um, at a bank, a secondary market.

18   Q.   All right.  And when did you start working for the

19   defendant?

20   A.   Um, July of 1989.

21   Q.   Okay.  And where was he working then?

22   A.   A firm called Day & Associates.

23   Q.   All right.  And what was your position when you

24   started working for him?

25   A.   A secretary to Jehu.

1    Q.   So could you just trace your employment with the
2    defendant?
3    A.   Um, so he was an associate with Day & Associates, he
4    became a partner, it changed to Day, Campbell & Hand.  I
5    believe we went in-house counsel with McKitrich Jackson
6    and DeMarco Peckenpaw, then we went in-house counsel for
7    a laser medical dental group, and in 1991 he went on his
8    own at Hand & Hand.
9    Q.   Okay.  Hand & Hand was the firm that he opened?
10   A.   Correct.
11   Q.   Okay.  And what were your responsibilities at Hand &
12   Hand?
13   A.   The secretary to Jehu and office administration.
14   Q.   And what was your salary?
15   A.   3,000 as I recall.
16   Q.   3,000 a --
17   A.   Monthly.
18   Q.   Okay.  Did you ever receive compensation in forms
19   other than a regular check with a W-2?
20   A.   No, we did, um -- I did get a bonus a couple of
21   times at the end of the year, but it was like stock.
22   But, no, it was always with W-2.  Until I went as a, um,
23   independent consultant.
24   Q.   Okay.  Did you ever receive compensation in cash?
25   A.   I was sometimes paid in cash, but I'm not sure what

```
 1    you're asking correctly -- or that I'm answering
 2    correctly.
 3    Q.   I may not be.
 4         Did you ever receive any part of your compensation
 5    in the form of cash?
 6    A.   Yes.
 7    Q.   And how would that work, who gave you the cash?
 8    A.   Um, I was permitted to take it out of an account.
 9    Q.   Well what account?
10    A.   Um, usually it was the operating account, the Hand &
11    Hand operating account.
12    Q.   Okay.
13    A.   If the funds were in one of the other company
14    accounts and I was -- well I was to take it from there.
15    Q.   Okay.  What other company accounts are you referring
16    to?
17    A.   Um, we had several accounts for, um, clients, um, in
18    particular like Esthetics World would receive money in
19    there and then I could take it from there.
20    Q.   Okay.  And when you say "clients," are you referring
21    to clients of the firm?
22    A.   Um, both.  Companies.  They were all clients.  So,
23    yeah, any company -- any of the companies that we had
24    incorporated were clients to me.
25    Q.   You considered them "clients"?
```

1   A.  Yes.  Yeah.

2   Q.  So, um, in general you said that you had worked as

3   everything from his secretary to office administration.

4   Could you just describe a little bit more what type of

5   work you would do?

6   A.  Um, everything from ordering supplies to paying

7   invoices, um, secretarial, um, Girl-Friday, just

8   anything.  Oftentimes it was just Jehu and I, so I was

9   his -- everything that wasn't legal work, that's what I

10  was doing.

11  Q.  Okay.  And in addition to Hand & Hand, did the

12  defendant have any businesses outside the country?

13  A.  He did at times, yes.

14  Q.  Okay, which ones?

15  A.  Um, he was the owner of a -- of a basketball team in

16  Belarus.

17  Q.  In Belarus?  I'm sorry.

18  A.  In Belarus, yeah.  And he had a Russian dating site

19  -- I think that was in Russia.  That was all I know.

20  Q.  Okay.  In the 2011, 2012 time period, where were the

21  offices of Hand & Hand?

22  A.  I think it was the boat yard.  We had an office from

23  a boat yard we rented.  And also our homes we were

24  working -- I was working from home at that time.

25  Q.  Okay.  When you said "boat yard," where was the

1    "boat yard"?

2    A.   Um, Victoria Boulevard, in Dana Point.

3    Q.   In Dana Point?

4    A.   Yeah, in California.   Everything was California.

5    Q.   Okay.   And did you and the defendant always work in

6    the same space?

7    A.   Most of the time, but not always.

8    Q.   So you indicated you worked from your home at times,

9    is that correct?

10   A.   Yeah, there were a couple of times that I was

11   working at home.

12   Q.   Okay.   Did there come a time when that became

13   permanent, that you worked from your home?

14   A.   Yes, in July of 2012.

15   Q.   All right.   On what occasion did that change?

16   A.   Jehu moved out of the country.

17   Q.   And where did he move?

18   A.   Antigua.

19   Q.   Okay.   What type of work was the defendant doing

20   during that time period?

21   A.   Um, the same work, law work, um, the same as we had

22   always done.

23   Q.   Okay, what type of law work though?

24   A.   Corporate.

25   Q.   Okay.   What if any involvement did he have with

1    respect to incorporating companies and filing reports

2    and that type of thing?

3    A.   Incorporating companies was usually me, um, he would

4    give me a name and tell me a state, which was usually

5    Wyoming.  But as to filings for companies, he did all of

6    that.  It was on the EDGAR system.

7    Q.   Okay.  And was this work for his own corporations or

8    for those of clients?

9    A.   Um, mostly for himself.

10   Q.   Okay.  How often did you have clients come into the

11   office?

12   A.   Seldom.

13   Q.   And approximately how many corporations did the

14   defendant himself control when you worked for him?

15          MR. IREDALE:  Objection, it calls for a legal

16   opinion or conclusion.  Speculation.

17          THE COURT:  I'm not sure I understood the

18   question, so we'll ask Mr. Herbert to ask it again.

19          MR. HERBERT:  Yes, I'll ask it a different

20   way.

21   Q.   To the best of your knowledge and experience in

22   dealing with these corporations, about how many did the

23   defendant himself exercise control over when you worked

24   for him?

25          MR. IREDALE:  Same objection.

1           THE COURT:  Yeah, sustained.

2           MR. HERBERT:  Okay.

3    Q.  About how many corporations did you deal with in

4    your day-to-day work with the defendant over the time

5    you worked with him?

6    A.  On a regular basis?  Maybe 20.

7    Q.  Uh-huh.  And how about how many total corporations

8    do you recall, um, approximately dealing with?

9    A.  That I incorporated or?

10   Q.  Sure.

11   A.  You mean -- well more than 60.

12   Q.  So what was the process to start a new corporation?

13   A.  It was quite simple actually, you just created

14   articles of incorporation and I would e-mail it to an

15   agent and he would file it.

16   Q.  And what if anything did the defendant have to do

17   with that process?

18   A.  Just the instruction of -- with the name and file

19   it.

20   Q.  Okay.  And what other documents would you help

21   prepare in connection with these corporations?

22   A.  Um, prepare as in draft or type?

23   Q.  Either one.

24   A.  My work was always typing, um, producing it.  But I

25   never drafted anything or created something.

1  Q.  Okay, what did you do with respect to -- do you know

2  what an S-1 registration statement is?

3  A.  I'm familiar with the name, but I don't know the

4  details of it.

5  Q.  Okay.  What if any involvement would you have with

6  respect to preparing S-1 registrations?

7  A.  Just typing.

8  Q.  And how about with respect to annual or quarterly

9  reports?

10  A.  The same.

11  Q.  And how would you know what to type?

12  A.  Um, the usual procedure would be he would have a

13  markup of a prior, you know, scribbled out, and what's

14  the new stuff to be put in, and I would create it on the

15  computer.

16  Q.  Okay.  Did you then file any of these documents with

17  the SEC?

18  A.  In the early days I did, but that was all done

19  manually, um, paper versions.

20  Q.  Okay.

21  A.  And when it all went to online, it was an EDGAR

22  system that involved HTML and ASC computer stuff that I

23  don't understand.

24  Q.  Okay.  So who did those filings through the EDGAR

25  system?

1   A.   Jehu.

2   Q.   All right.   Now when you were incorporating a, um,

3   company, how would you know whom to list as officers of

4   the corporation?

5   A.   It would be written on the markup.

6   Q.   That you got from the defendant?

7   A.   Yes, sir.

8   Q.   Were you ever listed as "President"?

9   A.   Yes.

10  Q.   And when -- on occasions when you were listed as

11  "President," was that your decision or was that the

12  defendant's?

13  A.   No, it was Jehu.

14  Q.   Okay.   And just in general terms, was there any

15  pattern or practice with respect to, um, who else would

16  be listed as officers of these corporations?

17  A.   I'm sorry, ask again?

18  Q.   Yeah, just as a matter of general office pattern and

19  practice, was there any, um, practice with respect to

20  who else would be listed as officers of these

21  corporations?

22  A.   Not that I know of.

23  Q.   Okay.   Did, um -- to the best of your knowledge, did

24  the defendant ever have you put down individuals that

25  you understood to be friends of his?

1    A.   Yes.

2    Q.   Okay.   How about girlfriends of his?

3    A.   Um, I think so.

4    Q.   Ex-wives?

5    A.   I'm not sure.

6    Q.   Okay.   Did you meet all of these people that were

7    listed as officers of these companies?

8    A.   No.

9    Q.   As far as you were able to determine, in terms of

10   your day-to-day dealings with respect to these

11   companies, were these, um, friends, girlfriends, et

12   cetera, exercising any control over these companies?

13              MR. IREDALE:   Objection.

14              THE COURT:   Um, sustained.

15   Q.   Well with respect to these companies in general,

16   whom did you get instructions from?

17              MR. IREDALE:   Objection to the vague --

18              THE COURT:   No, it's not vague.

19       From whom did you receive your instructions with

20   respect to preparing papers, um, relative to the various

21   corporations?   From whom?

22              THE WITNESS:   Jehu.

23              THE COURT:   Anyone else?

24              THE WITNESS:   No.

25              THE COURT:   Go from there.

1          MR. HERBERT:  Thank you, your Honor.

2     Q.  And for companies where you were listed as

3     "President," did you think you had the power to make

4     decisions on behalf of that company?

5     A.  No.

6     Q.  Who did you understand to have that power?

7     A.  Jehu.

8     Q.  And to your knowledge do these corporations that the

9     defendant was forming have any business operations?

10          MR. IREDALE:  Objection.  Broad.  General.

11     Vague.

12          THE COURT:  Um, I think I'm going to sustain

13     it.  Maybe we could come to this case.

14          MR. HERBERT:  Yes, your Honor.

15     Q.  Have you ever heard of the term "shell corporation"?

16     A.  Yes.

17     Q.  Where did you first hear that term?

18     A.  From Jehu.

19     Q.  Okay.  Did you ever hear that term used with respect

20     to any of these corporations that you were forming?

21     A.  Yes.

22     Q.  Did you ever hear of a company called "Crown

23     Marketing"?

24     A.  Yes.

25     Q.  And what was that?

1    A.   I don't know.

2    Q.   Okay.  Do you know who controlled Crown Marketing?

3             MR. IREDALE:  Objection.  A legal conclusion.

4             THE COURT:  Well in that form, I'll sustain

5    it.  Let's ask this question.

6         Crown Marketing now, um, from your -- did you have

7    anything to do with preparing any papers having to do

8    with Crown Marketing?

9             THE WITNESS:  Typing them, yes.

10             THE COURT:  Yeah, typing them.  All right.

11    And what names do you recall of people named as officers

12    of Crown Marketing or otherwise involved in Crown

13    Marketing?  What names?

14             THE WITNESS:  I don't -- Jehu is the only one

15    I would know of.

16             THE COURT:  He's the only one that you knew

17    of.  But there were other names, weren't there?

18             THE WITNESS:  Most likely, yes.

19             THE COURT:  But you don't recall?

20             THE WITNESS:  No, I don't.

21             THE COURT:  All right, go ahead, Mr. Herbert.

22             MR. HERBERT:  Thank you, your Honor.

23         Could we have Exhibit 112, please.

24             (On screen.)

25    Q.   All right.  Do you recognize this document,

1    Ms. Peterson?

2    A.   Yes, these are the articles of incorporation for

3    Crown Marketing.

4    Q.   Okay.   And what if anything did you have with

5    respect to the preparation of this document?

6    A.   I probably typed it.

7    Q.   Okay.

8              MR. HERBERT:   Could we look at the, um -- just

9    highlight or blow up the 6th paragraph on Page 1.

10             (Enlarged.)

11   Q.   Okay.   And it says "The incorporator and his Post

12   Office address is as follows:   Jehu Hand, 24 Calle de la

13   Luna, San Clemente, California."

14        Do you recognize that address?

15   A.   Yes, that's my home address.

16             MR. HERBERT:   And could we go to Page 2,

17   please.

18             (On screen.)

19   Q.   The date that's on this, the 28th day of June 2010,

20   is that accurate, as far as you know, as to when this

21   was incorporated?

22   A.   As far as I know, yes.

23   Q.   Do you recognize the signature on Page 2?

24   A.   That's Jehu's.

25   Q.   Okay.   Did Crown Marketing have a bank account as

1    far as you know?

2    A.  I don't recall.

3    Q.  Okay.  When these companies -- did any of the

4    companies that you incorporated have bank accounts?

5    A.  Yes.

6    Q.  Okay.  And who was responsible for opening those

7    bank accounts?

8    A.  Myself.

9    Q.  Okay.

10            MR. HERBERT:  Could we have Exhibit 113,

11   please.

12            (On screen.)

13   Q.  Do you recognize Exhibit 113?

14   A.  Yes, this is an opening statement for Green 4 Green

15   at Union Bank.

16   Q.  And what was "Green 4 Green"?

17   A.  A shell.

18   Q.  Okay.  And was Union Bank a bank that you would

19   typically use to open accounts for these companies?

20   A.  Not typically, but we used it a couple of times.

21   Q.  All right.  From whom did you receive instructions

22   with respect to Green 4 Green?

23   A.  Jehu.

24   Q.  Did you receive instructions from anyone else?

25   A.  No.

1    Q.   Did Green 4 Green have any business operations that

2    you knew of?

3    A.   Not that I know of.

4    Q.   Okay.

5              MR. HERBERT:   Could we look at the bottom of

6    Page 1 on the left.

7              (On screen.)

8    Q.   Whose address is listed there?

9    A.   It's my home address.

10   Q.   Your home address.   Okay.

11             MR. HERBERT:   And could we go to Page 4,

12   please.

13             (On screen.)

14   Q.   Do you recognize the signatures on this page?

15   A.   Yes.   The top one is Yuri Semenov and the second one

16   is mine.

17   Q.   Okay, the second one's yours?

18   A.   Yes.

19   Q.   All right.   How common was it for you to be an

20   authorized signatory to bank accounts for these

21   companies?

22   A.   Very common.

23   Q.   And this lists Yuri Semenov as President of Green 4

24   Green.   Do you know Yuri Semenov?

25   A.   I do.

1    Q.   How do you know him?

2    A.   I met him on several occasions.

3    Q.   Where did you meet him?

4    A.   The first time in the Ukraine.

5    Q.   In the Ukraine.  And what were you doing there in

6    the Ukraine?

7    A.   I was at Jehu's wedding.

8    Q.   And what if anything did Yuri Semenov have to do

9    with that wedding?

10   A.   He was a friend of Jehu's, he might have been the

11   best man.

12   Q.   And do you know where Mr. Semenov lives?

13   A.   Kiev, I believe.

14   Q.   And is that in the Ukraine?

15   A.   In the Ukraine, yes, sorry.

16   Q.   And do you recognize that as his signature?

17   A.   Yes, I do.

18   Q.   How are you able to recognize his signature?

19   A.   I was there on this occasion, I watched him sign it.

20   Q.   Okay.  Did you ever receive any instructions from

21   Mr. Semenov as President of Green 4 Green?

22   A.   I don't believe so.

23   Q.   And, um --

24            MR. HERBERT:  Could we have Exhibit 114,

25   please.

```
 1                    (On screen.)
 2    Q.   And do you recognize this document?
 3    A.   It's an opening statement for Able Direct Marketing
 4    at Union Bank.
 5    Q.   Okay.   And, um, do you recognize -- and on the
 6    bottom left, is that again your address?
 7    A.   Yes, it is.
 8    Q.   And then below that --
 9                    MR. HERBERT:   I wonder if we could blow that
10    up.
11                    (Enlarged.)
12    Q.   Do you recognize that?
13    A.   That's my old home phone number.
14    Q.   What was Able Direct?
15    A.   Um, another shell.
16    Q.   And, um, from whom did you receive your instructions
17    with respect to Able Direct?
18    A.   Jehu.
19    Q.   From anyone else?
20    A.   No.
21    Q.   Okay.
22                    MR. HERBERT:   Now could we go to Page 2,
23    please.
24                    (On screen.)
25    Q.   All right.   And do you recognize your signature
```

1    there?

2    A.   Yes.

3    Q.   Okay.   And, um --

4              MR. HERBERT:   And could we go to Page 4,

5    please.

6              (On screen.)

7    Q.   And your signature on Page 4 as well?

8    A.   Yes.

9    Q.   Okay.   So --

10             MR. HERBERT:   If we could just blow that up,

11   your signature's above something that says "Owner."

12             (On screen.)

13   Q.   Did you consider yourself the owner of Able Direct

14   Marketing?

15   A.   No.

16   Q.   Did you consider yourself the owner of this bank

17   account?

18   A.   Of the bank account?   Well I mean I was the only

19   signer, so --

20   Q.   Okay.   Did you believe that the funds in that bank

21   account were your funds?

22   A.   Oh, no.

23   Q.   All right.

24             MR. HERBERT:   If you could go to Exhibit 113,

25   please.

```
 1                    (On screen.)
 2    Q.  So you said these were bank records for Green 4
 3    Green, is that correct?
 4    A.  Yes.
 5                MR. HERBERT:  Could we go to Page 35.
 6                    (On screen.)
 7    Q.  All right.  Do you recognize this?
 8    A.  Okay, it's a, um, check from Able Direct to Green 4
 9    Green.
10    Q.  Okay.  And who signed that check?
11    A.  Myself.
12    Q.  All right.  And who deposited the check?
13                MR. HERBERT:  If we could just scroll down a
14    bit.
15                    (On screen.)
16    A.  Probably me.  Yeah, that's my writing.
17    Q.  Okay.  And what was this check for?
18    A.  Um, for purchase of Crown Marketing shares.
19    Q.  Okay.  All right.
20                MR. HERBERT:  Could we go to actually DK,
21    please.
22                    (On screen.)
23                MR. HERBERT:  Oh, I'm sorry, just for the
24    witness.  Thank you.
25                    (On witness screen.)
```

1    Q.   Do you see that in front of you?

2    A.   Yes, a subscription for Crown Marketing.

3    Q.   Okay.  And, um --

4              MR. HERBERT:  Could we go to the second page,

5    please, and then the third.  (On screen.)  Okay.

6    Q.   Now, um, what if anything did you have to do with

7    the preparation of this subscription agreement?

8    A.   Yeah, it's likely I could have typed it.

9    Q.   Okay.

10             MR. HERBERT:  Your Honor, we'd offer this as

11   Exhibit 115, please.

12             THE COURT:  Well again I understood the

13   protocol was that if you put numbers on them, they're in

14   evidence.

15        And you have no objection, Mr. Iredale, to 115?

16             MR. IREDALE:  Your Honor, I believe it's --

17             MR. HERBERT:  I'm being told it's already in

18   evidence.

19             THE COURT:  Yes, so let's not waste time.

20   It's in evidence.

21             MR. HERBERT:  All right.

22   Q.   Do you recognize the address for Able Direct on Page

23   3 there?

24   A.   Yeah, I think that's the boat yard address.

25   Q.   Okay.  And do you recognize the first signature on

```
 1    that Page 3?
 2    A.  Um, "Katerina Konuschenko," I think, or "Katya
 3    Konuschenko."
 4    Q.  Okay.  Do you know where she lives?
 5    A.  No, I don't.
 6    Q.  Okay.  Have you ever met her or spoken to her on the
 7    phone?
 8    A.  No, I haven't.
 9    Q.  Have you ever sent anything to her?
10    A.  I don't think so.
11    Q.  Do you know of any connection she has to the
12    defendant?
13    A.  I think he dated her.
14    Q.  Okay.  Did you ever see her sign anything?
15    A.  No, I didn't.
16    Q.  So do you know if that is her real signature?
17    A.  No, I don't believe it is.
18    Q.  Why do you say that?
19    A.  I don't know.  Because I think I tried to sign this
20    before and -- it looks vaguely familiar.
21    Q.  I'm sorry, could you explain that?  You said you
22    think you tried to sign this before?
23    A.  Yeah, I think I tried to sign her name and I -- and
24    she had some weird signature, so.
25    Q.  What would have prompted you to try to sign her
```

1    name?

2                    MR. IREDALE:  Objection, it calls for an

3    opinion or a conclusion.

4                    THE COURT:  No, he's asking her.

5         Why did you try to sign her name?

6                    THE WITNESS:  Jehu asked me to.

7    Q.  Do you recognize the signature below hers?

8    A.  That's Jehu's.

9    Q.  Um -- all right.

10                   MR. HERBERT:  Go back to Exhibit 113, Page 29,

11   please.  (On screen.)  13, Page 29.  (On screen.)  Oh,

12   I'm sorry, Page 35.  My mistake.

13                   (On screen.)

14   Q.  Why did you make out that check?

15   A.  For the purchase of the Crown Marketing shares.

16   Q.  Okay.  On whose initiative was that?

17   A.  Jehu.

18   Q.  Okay.  Did you ever decide on your own to write a

19   check from any one of these accounts?

20   A.  No.

21                   MR. HERBERT:  Could we go to Exhibit 116,

22   please.

23                   (On screen.)

24   Q.  Do you recognize that?

25   A.  It's opening account records for Annahuac Management

1    at Bank of America.

2    Q.   And what is "Annahuac Management"?

3    A.   A shell.

4    Q.   Okay.  And, um, which names, if anyone's, did you

5    associate with Annahuac Management?

6    A.   Yuri Semenov.

7    Q.   All right.  Did you ever, um -- from whom did you

8    receive instructions with respect to Annahuac

9    Management?

10   A.   Jehu.

11   Q.   Okay.  Did you ever receive any instructions from

12   Mr. Semenov?

13   A.   No.

14   Q.   All right.

15           MR. HERBERT:   Towards the middle of Page 1,

16   take a look at that.

17           (On screen.)

18   Q.   You're listed as "President of Annahuac Management."

19   Did you have the authority of President of that company?

20   A.   No.

21   Q.   All right.

22           MR. HERBERT:   Could we go back to Exhibit 113,

23   Page 21, please.

24           (On screen.)

25   Q.   All right.  Do you recognize that?

1    A.  Yeah, this is an Annahuac check for the Crown
2    Marketing shares.
3    Q.  All right.  And whose address is listed under
4    "Annahuac Management"?
5    A.  That's my home address.
6    Q.  Okay.  And whose signature is on there?
7    A.  That's mine.
8    Q.  And who deposited this check for Green 4 Green?
9    A.  Myself.
10   Q.  And on whose instructions, if anyone's, did you sign
11   or deposit this check?
12   A.  Jehu.
13   Q.  All right.  And you said this check was for the
14   purchase of stock as well?
15   A.  For Crown Marketing shares, yeah.
16   Q.  Okay.
17             MR. HERBERT:  Could we go to Exhibit 1, DM,
18   please.  Can I just have a second.  (Pause.)  All right,
19   Exhibit 117, your Honor.
20             (On screen.)
21   Q.  Do you recognize this?
22   A.  Um, it's a Crown Marketing subscription agreement.
23   Q.  Okay.
24             MR. HERBERT:  Can we go to the third page of
25   this, please.

```
 1                    (On screen.)
 2    Q.  For which company?
 3    A.  Annahuac Management.
 4    Q.  All right.  Do you recognize the top signature on
 5    that page?
 6    A.  "William Wilkinson."
 7    Q.  All right.  Now didn't you say a minute ago that you
 8    associated Annahuac with Yuri Semenov?
 9    A.  I do.
10    Q.  But that's not Yuri Semenov's signature?
11    A.  No, it's not.
12    Q.  And the signature at the bottom?
13    A.  Jehu.
14    Q.  Okay.  And --
15              MR. HERBERT:  Could we go to Exhibit 118,
16    please.
17                    (On screen.)
18    Q.  And what is this?
19    A.  This is opening bank statements for Bioclean, Bank
20    of America.
21    Q.  And what was "Bioclean"?
22    A.  It was a shell.
23              MR. IREDALE:  Your Honor, I object, it calls
24    for a legal opinion and --
25              THE COURT:  No, it doesn't.
```

1          What was it?

2               THE WITNESS:  A shell as far as I know.

3               THE COURT:  She's not a lawyer and she's

4     giving us opinions as the person that she is.

5     Q.  Okay, again on Page 1 in the middle you're listed as

6     "President of Bioclean Products."  Were you in fact the

7     President of that company?

8     A.  No.

9     Q.  And from whom did you receive instructions on

10    Bioclean?

11    A.  Jehu.

12    Q.  From anyone else?

13    A.  No.

14    Q.  Okay.

15               MR. HERBERT:  Could we go back to Exhibit 113

16    on Page 34, please.

17               (On screen.)

18    Q.  Do you recognize that?

19    A.  This would be the check to purchase the Crown

20    Marketing shares of Bioclean.

21    Q.  Okay.  And is that your signature?

22    A.  It is.

23    Q.  And did you deposit the check?

24    A.  I did.

25    Q.  And do you recognize the handwriting on the check?

1    A.   It's mine.

2    Q.   Do you know why the address block was written out on

3    this check?

4    A.   This is one of the temporary checks you get when you

5    open an account.

6    Q.   And what was this check for?

7    A.   The purchase of Crown Marketing.

8    Q.   Okay.

9          MR. HERBERT:   Could we go to Exhibit 119,

10   please.

11          (On screen.)

12   Q.   And what is this?

13   A.   A subscription agreement for Crown Marketing.

14   Q.   Okay.

15          MR. HERBERT:   Could we go to Page 3.

16          (On screen.)

17   Q.   For which company?

18   A.   Bioclean Products.

19   Q.   Okay.  And, um, do you recognize the address for

20   Bioclean there on Page 3?

21   A.   Yeah, it's the boat yard.

22   Q.   Okay.  And, um, do you recognize the name that's

23   written on the top signature line?

24   A.   Um, yes, "Doris Turo."

25   Q.   Okay.  All right.  Who is Doris Turo?

1    A.   One of Jehu's girls -- girlfriends.

2    Q.   Do you know if they were ever married?

3    A.   I don't.

4    Q.   Okay.  And her last name is what?

5    A.   "Turo" or "Urueta Turo."  I don't know which one's

6    the last name.

7    Q.   Okay.  Do you know where she lives?

8    A.   Colombia.

9    Q.   And by "Colombia," are you referring to a city or a

10   country or --

11   A.   The country of Colombia.

12   Q.   Okay.  Have you ever met her?

13   A.   No.

14   Q.   Have you ever spoken to her?

15   A.   No.

16   Q.   Have you ever sent anything to her?

17   A.   Just money.

18   Q.   And do you know whether that is really her signature

19   on that document?

20   A.   It is not.

21   Q.   How do you know that?

22   A.   Because it's my version of hers.

23   Q.   Okay.  And was that your idea to sign Doris Turo's

24   name on that document?

25   A.   No.

1    Q.  Then what prompted you to sign Doris Turo's name on

2    that document?

3    A.  Jehu.

4    Q.  How common or uncommon was it for you to sign

5    another person's name on a document such as this?

6    A.  I only did it for Doris and, um, Karen, and I think

7    I tried for Katya.  So it was common for Doris and

8    Karen, but not for anyone else.

9    Q.  And what was Karen's full name?

10   A.  Karen Campo Nuriega.

11   Q.  And at whose instructions, if anyone's, did you sign

12   Karen Campo Noriega's name or Doris Turo's name on a

13   document?

14   A.  Jehu.

15   Q.  Did you ever sign other people's names on your own

16   initiative?

17   A.  No.

18   Q.  Did anyone other than the defendant ever ask you to

19   sign on behalf of Doris Turo or Karen Campo Noriega?

20   A.  No.

21   Q.  Okay.

22              MR. HERBERT:  Could we have Exhibit 146, Page

23   39, please.  (On screen.)  Blow up the text a little

24   bit.  (Enlarged.)

25   Q.  Do you recognize that?

1    A.   Yeah, I recognize it.  Yes.

2    Q.   Okay.  Directing your attention to the signature

3    under Bioclean Partners, do you recognize that signature

4    in particular?

5    A.   My version of "Doris."

6    Q.   Okay.  And do you recognize the signature under, um,

7    "signed in the presence of Jehu Hand"?

8    A.   That's Jehu's.

9    Q.   Okay.  And do you know whether he was present when

10   you signed as "Doris Turo"?

11   A.   I don't recall.

12              MR. HERBERT:  And, your Honor, just for the

13   record, by agreement of the parties Exhibit 146 will be

14   just this page, Page 39 of this document.

15              THE COURT:  And that's correct, Mr. Iredale?

16              MR. IREDALE:  It is, your Honor.

17              THE COURT:  And I appreciate him saying that

18   because you're going to see -- you're going to

19   physically have these documents and naturally neither

20   lawyer wants you to think that anything's been kept from

21   you.  This is what they agree has to do with this case.

22        Go ahead.

23              MR. HERBERT:  Thank you, your Honor.

24        Could we have Exhibit 120, please.

25              (On screen.)

1    Q.   Do you recognize this?

2    A.   Yeah, so this is an opening bank statement for

3    Coldserve Corporation.

4    Q.   Okay.  And can you tell when this account was

5    opened?

6    A.   In October of 2010.

7    Q.   Okay.  And who opened it?

8    A.   Myself.

9    Q.   Um, and again in the middle you're listed as

10   "President."  Did you have the authority as President

11   for Coolserve?

12   A.   No.

13   Q.   And what is "Coolserve"?

14   A.   A shell.

15   Q.   Um, and from whom did you get directions as to

16   Coolserve?

17   A.   Jehu.

18   Q.   And from anyone else?

19   A.   No.

20   Q.   Are you aware of any legal work that the defendant

21   did for Coolserve?

22   A.   Not other than the annual filings or quarterly and

23   annual filings.

24   Q.   Did you ever receive a payment from anyone in

25   connection with legal service for Coolserve?

1    A.   Not that I know of.

2    Q.   Okay.  Did you have any communication with anyone

3    claiming to be in control of Coolserve?

4    A.   No.

5    Q.   And at whose instructions did you open this account?

6    A.   Jehu.

7    Q.   Okay.

8              MR. HERBERT:   Could we go back to Exhibit 113,

9    Page 22, please.

10              (On screen.)

11   Q.   Do you recognize this?

12   A.   Yeah, this is a, um, check from the Hand & Hand

13   trust account and I'm assuming it's for the purchase of

14   the Crown Marketing shares -- or Coolserve.

15   Q.   Okay.  What was the Hand & Hand client trust

16   account?

17   A.   Yeah, that's the bank account where client funds are

18   held.

19   Q.   Okay.  And did you consider Coolserve to be a

20   client?

21   A.   Yeah.

22   Q.   And what was the date of this check?

23   A.   July 2010.

24   Q.   Okay.  And who signed it?

25   A.   Myself.

1    Q.   And, um, who deposited it?

2    A.   Myself.

3    Q.   And in the memo line it indicates it's for

4    Coolserve.   What was the purpose of putting that in the

5    memo line?

6    A.   So we'd know where to deduct the funds from.

7    Q.   Okay.   And how would you know to put Coolserve on

8    the memo line of this check?

9    A.   Jehu would have told me.

10   Q.   Okay.   Do you know why this check was written from

11   the client -- from the client trust account instead of

12   from a Coolserve bank account?

13   A.   I don't.   Maybe we didn't have a Coolserve account

14   at the time.   I'm not sure.

15   Q.   Okay.   Were you an authorized signatory to the

16   client trust account?

17   A.   Yes.

18               MR. HERBERT:   Could we have Exhibit 121,

19   please.

20               (On screen.)

21   Q.   Do you recognize this?

22   A.   The Crown Marketing subscription agreement.

23   Q.   And --

24               MR. HERBERT:   Could we go to Page 3, please.

25               (On screen.)

1  Q.  Do you recognize that address?

2  A.  Um, I recognize it as the Belarus address, but I

3  don't know where it is.

4  Q.  Okay.  Do you know whose signature is on the top

5  line there?

6  A.  "Alexander Sosnovsky."

7  Q.  Okay.  Do you know who that is?

8  A.  No.

9  Q.  Do you have any idea where he lives?

10  A.  I think Belarus.

11  Q.  Okay.  Do you know of any connection that he has to

12  the defendant?

13  A.  I don't know.

14  Q.  Okay.  And how do you recognize that signature?

15  A.  Um, just from having seen it on documents.

16  Q.  Have you ever witnessed him sign anything?

17  A.  No.

18  Q.  And the signature below that is?

19  A.  Jehu.

20  Q.  Okay.

21          MR. HERBERT:  Could we have Exhibit 122,

22  please.

23          (On screen.)

24  Q.  What is this?

25  A.  Opening records for Esthetics World, Bank of

1    America.

2    Q.   And the date?

3    A.   "October 09."

4    Q.   Okay, what is Esthetics World?

5    A.   Another shell.

6    Q.   And, um, from whom did you receive instructions with

7    respect to Esthetics World?

8    A.   Jehu.

9    Q.   And from anyone else?

10   A.   No.

11   Q.   What if any other names do you associate with

12   Esthetics World?

13   A.   Karen Campo.

14   Q.   Okay, and why do you associate her name with

15   Esthetics World?

16   A.   Um, she was listed as "President" or "owner" on all

17   docs.

18   Q.   Has Ms. Campo Noriega ever given you any

19   instructions with respect to Esthetics World?

20   A.   No.

21   Q.   Who did?

22   A.   Jehu.

23   Q.   And do you know who Karen Campo Noriega is?

24   A.   One of Jehu's girlfriends.

25   Q.   Do you know where she lives?

```
 1    A.   I think in Colombia, the country.

 2    Q.   Did you ever meet or speak with her?

 3    A.   No.

 4    Q.   Okay.

 5              MR. HERBERT:   Could we go back to Exhibit 113,

 6    Page 23, please.

 7              (On screen.)

 8    Q.   All right.   Now do you recognize that?

 9    A.   Um, the Esthetics World check for purchase of Crown

10    Marketing shares.

11    Q.   Okay, and the date on that is what?

12    A.   July 2010.

13    Q.   Who signed and deposited this check?

14    A.   Myself.

15    Q.   At whose instructions?

16    A.   Jehu.

17              MR. HERBERT:   Could we go to Exhibit 123,

18    please.

19              (On screen.)

20    Q.   Do you recognize this as a subscription agreement?

21    A.   Yes.

22              MR. HERBERT:   Could we go to Page 3.

23              (On screen.)

24    Q.   For which company?

25    A.   Esthetics World.
```

1    Q.   And, um, do you recognize the address next to

2    Esthetics World's name?

3    A.   That would be our resident agent address in Wyoming.

4    Q.   What is a "resident agent"?

5    A.   That's the gentleman who incorporated all of our --

6    of our corporations, that was his address.

7    Q.   Okay.  And do you recognize that first signature?

8    A.   That's my version of Karen.

9    Q.   So you signed that?

10   A.   I did.

11   Q.   And at whose instructions did you sign her name on

12   this subscription agreement?

13   A.   Jehu.

14   Q.   And whose signature's below?

15   A.   Jehu's.

16   Q.   Okay.

17            MR. HERBERT:  Could we go to Exhibit 124,

18   please.

19            (On screen.)

20   Q.   Do you recognize this document?

21   A.   Yeah, it looks like a shareholder ledger for

22   Esthetics World.

23   Q.   Uh-huh.  And do you see the date on that?

24   A.   Um, June of 2008.

25   Q.   Okay.  And do you recognize the signature on that?

1    A.   That's Jehu's.

2    Q.   Okay, and who does it indicate has the shares, all

3    the shares of that?

4    A.   Jehu.

5    Q.   Um -- and do you recognize the address under his

6    name on the top left?

7    A.   Yeah, that was our office address.

8              MR. HERBERT:   Could we go to Exhibit 125,

9    please.  (On screen.)  All right.

10   Q.   Do you recognize this document?

11   A.   Um, from having seen it, yes.

12   Q.   Do you recognize, um, your signature on this

13   document?

14   A.   Yes.

15   Q.   Okay.  And did you sign as a notary for this

16   document?

17   A.   Yes, correct.

18   Q.   Okay.  Did you have anything else to do with

19   preparing this document to the best of your knowledge?

20   A.   I don't think so because I don't speak Spanish.

21   Q.   Do you recall anything about the circumstances under

22   which this was created?

23   A.   No.

24   Q.   Okay.

25              MR. HERBERT:   Could we go to Exhibit 126,

```
1    please.
2              (On screen.)
3    Q.  Do you recognize that?
4    A.  Yeah, it looks like an e-mail address and a
5    password.
6    Q.  Okay.  Did you ever use this password to log into
7    Karen Campo Noriega's e-mail account?
8    A.  Not that I recall.
9    Q.  Okay.  All right.  Do you know who did?
10   A.  No.
11   Q.  Who else worked in your office?
12   A.  Most of the time it was just Jehu and myself.
13   Q.  All right.
14              MR. HERBERT:  Could we go back to Exhibit 113,
15   Page 20, please.
16              (On screen.)
17   Q.  Do you recognize that?
18   A.  It's a check from William Wilkinson, it looks like,
19   for the purchase of the Crown shares.
20   Q.  Okay, Ms. Peterson, do you know who "William
21   Wilkinson" is?
22   A.  No.
23   Q.  To the best of your knowledge have you ever met
24   Mr. Wilkinson?
25   A.  No.
```

1   Q.   Have you ever spoken to him?

2   A.   No.

3   Q.   Did you ever communicate with him in any other way?

4   A.   I think I e-mailed him a few times.

5   Q.   Okay, and did you ever get a response back from him?

6   A.   I don't think so.

7   Q.   Okay.  Did you ever send any mail to him?

8   A.   No.

9   Q.   Did you ever send him a fax or receive a fax from

10  him?

11  A.   No.

12  Q.   Okay.  Did you ever keep any contact information for

13  him?

14  A.   No.

15  Q.   What if anything did the defendant say to you about

16  William Wilkinson?

17  A.   He never said anything about him.

18  Q.   Are you aware of any legal work the defendant did

19  for William Wilkinson?

20  A.   No.

21  Q.   Did you ever receive any payment for legal services

22  from William Wilkinson?

23  A.   Not that I know of.

24  Q.   Did you ever receive any instructions from

25  Mr. Wilkinson to wire money anywhere?

1    A.   No.

2    Q.   And how did you come to know that name?

3    A.   Jehu.

4    Q.   Do you know where Mr. Wilkinson lives?

5    A.   No.

6    Q.   All right.  So do you recognize the address below

7    the name "William Wilkinson" on the check?

8    A.   It's my home address.

9    Q.   Did you receive bank statements for that account at

10   that address at your house?

11   A.   It's possible.

12   Q.   Okay, and what would you have done with them?

13   A.   I would have put them in a paper file.

14   Q.   Did you ever send them to Mr. Wilkinson?

15   A.   No.

16   Q.   Did he ever ask for them?

17   A.   Nope.

18   Q.   Do you recognize the William Wilkinson's signature

19   on that check?

20   A.   Yes.

21   Q.   And how do you recognize that?

22   A.   From having seen it on documents.

23   Q.   Did you ever witness him sign anything?

24   A.   No.

25              THE COURT:  Just a question.  And he's

1    focusing on Wilkinson.

2         But these various checks that you're being shown,

3    the copies, they all appear to be "For Deposit Only."

4    Do you know why that is?

5              THE WITNESS:  Why it's stated there?

6              THE COURT:  Yeah.

7              THE WITNESS:  That's what I put on the check

8    when I deposit it.

9              THE COURT:  Oh.  So in other words, just so I

10   understand, once you received it and deposited it in the

11   appropriate corporate account, you would endorse it "For

12   Deposit Only"?

13             THE WITNESS:  Yes.

14             THE COURT:  And that was your practice?

15             THE WITNESS:  Correct.

16             THE COURT:  Where did that practice come from?

17             THE WITNESS:  I don't know.  That's what I

18   learned.

19             THE COURT:  That's what you learned.  Fine.

20        Go ahead, Mr. Herbert.

21             MR. HERBERT:  Thank you, your Honor.

22        Could we have Exhibit 147, please.

23             (On screen.)

24   Q.  Do you recognize this?

25   A.  It's a FedEx label.

1    Q.   And, um, what if anything -- do you see your return

2    address on the top?

3    A.   Yes.

4    Q.   Okay.  And, um, do you recognize any of the

5    handwriting on this?

6    A.   Yeah, I crossed out "Drive" and wrote "Road."

7    Q.   Okay.

8            MR. HERBERT:   Could we go to the second page

9    of this.

10            (On screen.)

11   Q.   And do you recognize the individual for whom these

12   documents apply?

13   A.   Yeah, William Wilkinson.

14   Q.   Okay.  And if you look at -- do you see under "Home

15   Address" an address of "275 Palm Beach, Jolly Harbour,

16   Antigua"?

17   A.   Uh-huh.

18   Q.   Do you recognize that address?

19   A.   I recognize it, yes.

20   Q.   Okay.  Do you know who lives at that address or

21   lived?

22   A.   No, I don't.

23   Q.   Okay.  How about the daytime phone for Mr. Wilkinson

24   that's listed there, do you recognize that?

25   A.   I don't know.  No.

Q.   Okay.

          MR. HERBERT:  Could we go to Exhibit ER for

identification, um, and just for the witness.  I'm

sorry.

          (On witness screen.)

Q.   Yes.  Do you recognize that?

A.   No.

Q.   Okay.  Do you recognize on the top left, um, there's

a user name there.  Do you recognize that user name?

A.   Yeah, that's, um, the prefix to Jehu's e-mail.

Q.   Okay.  And then next to that, do you see a number?

          MR. IREDALE:  I object on the basis of the

best evidence rule, the document's not in evidence.

          MR. HERBERT:  I'm not asking her for the

contents of what's there, your Honor, I'm --

          THE COURT:  All right, this is a document not

in evidence.  All right.  I'll have that in mind.

     And I thank you, Mr. Iredale.

     Go ahead.  It's not being shown to the jury?

          MR. HERBERT:  Correct, your Honor.

          THE COURT:  Then go ahead.

Q.   Okay.  Do you see the number that's listed next to

that user name?

A.   I see it.

Q.   Okay.  And was that -- what if any relationship did

```
1   that have to the phone number we just saw?
2   A.  I think it was the same number, but I still don't
3   recognize it.
4   Q.  Okay.  All right.
5               MR. HERBERT:  So I would offer this as Exhibit
6   148, your Honor.
7               MR. IREDALE:  Your Honor, objection, lack of
8   foundation.
9               THE COURT:  And how is this document
10  denominated, what letters?
11              MR. HERBERT:  ER, your Honor.
12              THE COURT:  ER.  Sustained, without prejudice.
13  But on that foundation, sustained.
14              MR. HERBERT:  Yes, your Honor.
15          Could we have Exhibit 149, please.
16              (On screen.)
17              MR. IREDALE:  Just one second, your Honor.
18  Counsel indicates that we had a conversation and I
19  agreed to this admission.  As to the two entries
20  therefore, although my memory's not perfect, I consider
21  myself --
22              THE COURT:  Then withdraw the objection.
23              MR. IREDALE:  I withdraw the objection.
24              THE COURT:  It's withdrawn.  It may be
25  admitted as Exhibit --
```

1          And you called out the number?

2              MR. HERBERT:  The exhibit number would be 148,

3     your Honor.

4              THE COURT:  148 in evidence.

5              MR. HERBERT:  Thank you, your Honor.

6              THE COURT:  Thank you, both.

7              (Exhibit 148, marked.)

8     Q.  And taking a look at Exhibit 149, do you recognize

9     that?

10    A.  It's a Verizon phone bill.

11    Q.  Okay.

12             MR. HERBERT:  Could we go to Page 345, please,

13    of this.  (On screen.)  Okay.

14    Q.  Whose bill is this here?

15    A.  This is my bill.

16    Q.  Okay.  And who is Randall Peterson?

17    A.  My husband.

18    Q.  Okay.  And the date of this bill is what?

19             MR. HERBERT:  If we go to the bottom.

20             (On screen.)

21    A.  Um, November to December of 2012.  So December 28th,

22    2012.

23    Q.  Okay.

24             MR. HERBERT:  And on Page 346, if we could go

25    to that.

1                    (On screen.)

2    Q.   All right.   At the top it says "Detail for Kimberly

3    Hand," and then there's a phone number there.   Do you

4    know who "Kimberly Hand" is?

5    A.   Jehu owned the number before myself, so when I

6    pulled it to my personal account, they just never fixed

7    the name.

8    Q.   Okay.   And is that your phone number next to the

9    name?

10   A.   It is.

11   Q.   Okay.

12                  MR. HERBERT:   And could we go to Page 352,

13   please.

14                  (On screen.)

15   Q.   Okay.

16                  MR. HERBERT:   Could we blow up a column on

17   12-28 at 2:13 p.m.   (On screen.)   All right.

18   Q.   And do you see, um, that call there with that

19   305-407-3566 number?

20   A.   Uh-huh.

21   Q.   Do you know who that was with?

22   A.   No.

23   Q.   Okay.   Do you have any memory of speaking to a

24   Mr. Wilkinson on that phone at that time?

25   A.   No.

```
 1    Q.  All right.
 2              MR. HERBERT:  Could we go to Exhibit 127,
 3    please.
 4              (On screen.)
 5    Q.  And do you recognize this?
 6    A.  It's a subscription agreement for Crown Marketing.
 7              MR. HERBERT:  Could we go to Page 3, please.
 8              (On screen.)
 9    Q.  And this is for which?
10    A.  William Wilkinson.
11    Q.  All right.  And, um, I've asked you about the
12    address in Antigua.  Do you recognize the signatures?
13    A.  That's William Wilkinson, and Jehu.
14    Q.  And when you say "That's William Wilkinson," is that
15    the signature that you associated with William
16    Wilkinson?
17    A.  Yes, that's correct.
18    Q.  All right.
19              MR. HERBERT:  Could we go to Exhibit 193,
20    please.
21              (On screen.)
22    Q.  Do you recognize this document?
23    A.  This is an S-1 with the SEC.
24    Q.  Do you know who filed this with the SEC?
25    A.  Jehu.
```

1    Q.   And where was he in January of 2012?

2    A.   Um, California?  I'm not precise.

3    Q.   All right.  Do you know if you were in the Dana

4    Point office at that point?

5    A.   Um, I think we -- at least he was, I think, at the

6    boat yard address.

7    Q.   Okay.  Do you know what if any information was

8    required in order to file this with the SEC?

9    A.   No, I don't know.

10   Q.   Okay.  Do you know if there was a user name and

11   login that was required for the EDGAR system?

12   A.   Yes, for sure.

13   Q.   Okay.  And who in your office had the login

14   information to file documents electronically with the

15   SEC?

16   A.   Myself and Jehu.

17   Q.   Anyone else?

18   A.   No.

19   Q.   Okay.

20             MR. HERBERT:  Go to, um --

21   Q.   Well actually, before I do that, you testified

22   previously that you didn't file documents electronically

23   with EDGAR?

24   A.   No, I didn't know how.

25   Q.   Okay.

1          MR. HERBERT:  Could we go to Page 13, please.

2          (On screen.)

3   Q.  All right.  Do you see under "Management" it

4   indicates an "Igor Produn, Chief Exccecutive and

5   Financial Officer and Director"?

6   A.  Uh-huh.  Yes.

7   Q.  Do you know who Igor Produn is?

8   A.  A friend of Jehu's.

9   Q.  Okay.  Do you know anything about him?

10  A.  I don't.

11  Q.  Okay.  Do you know where he lives?

12  A.  I think he's in the Ukraine.

13  Q.  Okay.  Have you ever met him?

14  A.  No.

15  Q.  Did you ever speak to him on the phone?

16  A.  No.

17  Q.  Did you ever receive instructions from him with

18  respect to Crown Marketing?

19  A.  No.

20          MR. HERBERT:  Could we go to Page 15.

21          (On screen.)

22  Q.  Do you see there a list of selling stockholders --

23          MR. HERBERT:  Actually from the middle down.

24          (On screen.)

25  A.  Yes.

1    Q.   Okay.  Did you have 1,000 shares of Crown Marketing

2    stock yourself?

3    A.   I did.

4    Q.   How did that come about?

5    A.   Um, I was given a subscription agreement and

6    purchased shares.

7    Q.   Okay.  And who gave you the subscription agreement?

8    A.   Jehu.

9    Q.   And do you recall how much you paid for those

10   shares?

11   A.   Probably $100.

12   Q.   Did you ever sell those shares?

13   A.   I don't recall.

14   Q.   Okay.  And after signing a subscription agreement,

15   did you have any more involvement in the process of

16   listing the shares or their subsequent sale?

17   A.   Um, no.

18   Q.   Were you involved in the promotion of the stock?

19   A.   No.

20   Q.   Who are "Randall" and "Taylor Peterson"?

21   A.   Husband and daughter.

22   Q.   Okay.  And Vicky Foster?

23   A.   A friend.

24   Q.   Of yours?

25   A.   Yes, a friend of mine.

1    Q.   Okay.  Christie Roberts?

2    A.   My sister.

3    Q.   Richard Solotsky?

4    A.   Father.

5    Q.   Mary Roberts Solotsky?

6    A.   Mother.

7    Q.   Scott Roberts?

8    A.   Brother.

9    Q.   Jody Roberts?

10   A.   Sister-in-law.

11   Q.   Okay.  Did they all have shares in Crown?

12   A.   They did.

13   Q.   How did they get them?

14   A.   The same way as me, signed the subscription

15   agreement and purchased for $100.

16   Q.   Okay.  Do you know what "Pacific Coast

17   Administrators" was?

18   A.   A company of Adam's.

19   Q.   Adam who?

20   A.   Adam Hand, Jehu's brother.

21   Q.   Do you know what kind of business Adam Hand was in?

22   A.   No, I don't.

23   Q.   Did he ever work out of the defendant's office?

24   A.   A couple of times, yes.

25   Q.   Do you know approximately when?

1    A.   Um, between 2010 and 2012.

2    Q.   Okay.  And to the best of your knowledge did he ever

3    do any work for the defendant's firm?

4    A.   No.

5    Q.   Okay.  Do you see on this page a reference to

6    "Bioclean"?

7    A.   Yes.

8    Q.   And then there's a footnote down below that says the

9    control person is "Doris Urueta"?

10   A.   Yes.

11   Q.   Do you know who that is?

12   A.   Well that's the name I associate with Bioclean.

13   Q.   Okay.  So was she the same individual that you

14   referred to as "Doris Turo"?

15   A.   "Doris Urueta Turo," that was her full name.

16   Q.   And, um --

17              THE COURT:  Excuse me, Mr. Herbert, I think

18   we're going to take the morning recess a little early

19   this morning.

20        And so we will take the morning recess until about

21   7 minutes after 11:00.  You have not heard all the

22   testimony, so please keep your minds suspended, do not

23   discuss the case either among yourselves, nor with

24   anyone else.  We'll stand in recess for one half hour.

25   We'll recess.

1          THE CLERK:  All rise for the jury.

2          (Jury leaves, 10:40 a.m.)

3          THE COURT:  Please be seated.

4      Before we recess, just a request of you,

5  Mr. Herbert.  About how much longer have you for this

6  witness?

7          MR. HERBERT:  Um, I'm about halfway through,

8  so maybe another hour, your Honor.

9          THE COURT:  Thank you.  We'll recess.

10          (Recess, 10:40 a.m.)

11          (Resumed, 11:10 a.m.)

12          THE COURT:  Go ahead, Mr. Herbert.

13          MR. HERBERT:  Thank you, your Honor.

14  Q.  Ms. Peterson, before the break we were looking at

15  Exhibit 193, Page 15.

16          MR. HERBERT:  If you'd bring that up again.

17          (On screen.)

18  Q.  In addition to the individuals you listed, um, that

19  were related to you or friends of yours, do you see

20  underneath that, um, the list of other individuals,

21  "Pacific Coast Administrators," "William Wilkinson," et

22  cetera?

23  A.  Yes.

24          MR. HERBERT:  And if we go actually down to

25  the bottom.

```
1              (On screen.)
2    Q.  I think we were just talking about the control
3    person for Bioclean Products was Doris Urueta, is that
4    correct?
5    A.  Yes.
6    Q.  Okay.
7              MR. HERBERT:  And then also there looks like
8    there's footnotes that continue onto the next page.  If
9    we just go back to 15 for just a second.
10             (On screen.)
11   Q.  All right.  So it indicates for Able Direct
12   Marketing the control person is Katya Konuschenko.  Do
13   you recall that?
14   A.  Yes.
15   Q.  And then for Coolserve --
16             MR. HERBERT:  Can we go to the next page,
17   please.
18             (On screen.)
19   Q.  The control person is Alex Sosnovsky?
20   A.  Yes.
21   Q.  For Annahuac Management, it indicates Yuri Semenov?
22   A.  Yes.
23   Q.  And for Esthetics World, Karen Campo?
24   A.  Yes.
25   Q.  All right.
```

1        Did you ever discuss any of these companies with

2   anyone listed in this S-1 as a control person?

3   A.  No.

4   Q.  Okay.

5        MR. HERBERT:  Your Honor, the parties have

6   reached a stipulation with respect to Exhibit 205.  If

7   we could bring that up.

8            (On screen.)

9        MR. HERBERT:  The parties have stipulated that

10  Exhibit 205 is an accurate English translation of the

11  document that was in evidence as Exhibit 125.

12           THE COURT:  So stipulated, Mr. Iredale?

13           MR. IREDALE:  Yes, your Honor.

14           THE COURT:  Thank you.

15       And you understand what a stipulation is.

16       Go ahead, Mr. Herbert.

17           MR. HERBERT:  Thank you, your Honor.

18  Q.  Taking a look at this English translation of the

19  document that we previously looked at as Exhibit 125 --

20  A.  Uh-huh.

21  Q.  -- it says:  "March 18th, 2011, I authorize Karen

22  Edith Campo Noriega with us to do as follows:  To take

23  our daughter, Tanya Michelle Hand Campo, outside of the

24  Republic of Colombia to travel abroad."  And there's a

25  signature and it says "Jehu Thomas Degerold Hand," with

1    passport number.  And then you had signed, you indicated

2    as to the notary of that.

3           In taking a look at this English translation, does

4    that, um, refresh your memory as to whether you knew

5    anything as to the circumstances under which this

6    document was created?

7    A.  Um, it's vaguely familiar, but otherwise no.

8    Q.  Okay.  And do you recognize that to be the

9    defendant's entire name, "Jehu Thomas Degerold Hand"?

10   A.  Yes.

11          MR. HERBERT:  Could we go to Exhibit 133,

12   please.  Could we just blow up the text there, please.

13          (Enlarged.)

14   Q.  Okay.  This is a document that is signed by "Igor

15   Produn, President."  And if you just take a look at that

16   first sentence, it says:  "All investors were solicited

17   by an Officer, Kimberly Peterson, who was Assistant

18   Treasurer at the time and now Corporate Secretary as

19   well and by Mr. Produn."

20          Did you solicit any investors in Crown Marketing

21   other than the friends and family you've testified

22   about?

23   A.  No.

24   Q.  And if you look at the third sentence of Paragraph

25   1, "The purchasers in the unit offering are all

1    customers of Ms. Peterson's secretarial services

2    business, except for Annahuac Management, which is owned

3    by a friend of Mr. Produn."

4         Were any investors in Crown Marketing customers of

5    your secretarial services business?

6    A.  No.

7    Q.  Did you even have a secretarial services business in

8    2012?

9    A.  Well, I think I was working as a consultant so, um,

10   yeah, that would have been it.

11   Q.  Did you have any customers other than the defendant?

12   A.  No.

13              MR. HERBERT:  Could we go to Exhibit 128,

14   please.

15              (on screen.)

16   Q.  All right.  This is a letter dated April 5th, 2012

17   from Mark Dillon of Pennaluna to Eric Mayes at FINRA.

18   Do you know what "FINRA" is?

19   A.  It's a regulatory agency.

20   Q.  And do you know what "Pennaluna" is?

21   A.  A brokerage firm.

22   Q.  Okay.

23              MR. HERBERT:  Could we go to Page 2, please.

24   Q.  So Mr. Dillon's letter attaches a March 29th, 2012

25   letter from FINRA, which, if you look at the end of the

1    first paragraph, it requests certain information.  Do

2    you see that?

3    A.  Yes.

4    Q.  And if we look at Page 3, at Number 7, do you see

5    what they're asking for there?

6    A.  Yeah, they want to see the executed subscription

7    documents and the checks for each of those.

8    Q.  All right.  Do you know whether you ever saw this

9    letter when it came in?

10   A.  I probably did.

11   Q.  Okay.

12            MR. HERBERT:  Could we go to Exhibit 129,

13   please.

14            (On screen.)

15   Q.  Do you recognize this document?

16   A.  Yes.

17   Q.  Okay, what do you recognize that to be?

18   A.  It was an e-mail from Jehu to myself to, um, get

19   copies of cancelled checks.

20            MR. HERBERT:  Can we just blow up the header

21   on that.

22            (Enlarged.)

23   Q.  Okay.  What's the sending e-mail address?

24   A.  Jehu's.

25   Q.  "Dohenyboy@aol.com"?

1    A.   Yes.

2    Q.   Okay.  Did he use that to communicate with you over

3    the years?

4    A.   Yes, often.

5    Q.   And the receiving e-mail?

6    A.   Is my personal.

7    Q.   Okay.  And did you use any other e-mail address in

8    connection with your business?

9    A.   No.

10   Q.   All right.  So the subject line reads:  "Did you see

11   the note about the five canceled checks I need?  RE:

12   Green 4 Green, etc. deposits July and September 2010,"

13   and this e-mail's dated April 2nd of 2012.

14        Do you know what the reference to the note was in

15   the subject line?

16   A.   Yes, it referred to the Dillon letter, or the FINRA

17   letter.

18   Q.   Okay.

19           MR. HERBERT:  And if we could collapse that

20   and then just blow up the handwriting on that page.

21           (On screen.)

22   Q.   Do you recognize the handwriting on this page?

23   A.   Yeah, the top half is mine and the bottom half is

24   Jehu's.

25   Q.   Okay.  And what does your handwriting refer to

1    there?

2    A.   That would be the bank account, the check number,

3    the date, and the amount.

4    Q.   Okay.  All right.  And where it says "E-World," what

5    does that refer to?

6    A.   "Esthetics World."

7    Q.   Okay.  And "Wilkinson," what does that refer to?

8    A.   "William Wilkinson."

9    Q.   Okay.  "H & H and WFB Trust"?

10   A.   "Hand & Hand Wells Fargo Bank Trust."

11   Q.   Okay.  And that wasn't one of the items listed in

12   the FINRA letter, do you know why that's on there?

13   A.   Um, we probably used that client's fund from that

14   trust account.

15   Q.   Okay.  And do you recall seeing a check earlier, a

16   bank check, um --

17   A.   Right, the Coolserve, I think.

18   Q.   The Coolserve?

19   A.   Yes.

20   Q.   All right.  Do you know what your note "Ordered"

21   means?

22   A.   I ordered it from the bank.

23   Q.   All right.

24        Now, Ms. Peterson, in 2016 did you receive a grand

25   jury subpoena in this case?

1   A.   I'm sorry, when?

2   Q.   In 2016 -- or 2015.

3   A.   Yes.  Yes.  Yes.

4   Q.   Okay.  What if anything did you do with respect to

5   document retrieval in response to that subpoena?

6   A.   I ordered any documents they asked for and I sent

7   them to my attorney.

8   Q.   Okay, ordered them from where?

9   A.   From storage.

10  Q.   Whose storage?

11  A.   "Offsite Storage," a company we used for years.

12  Q.   Okay, was that your own personal storage or was that

13  --

14  A.   No, office storage.

15  Q.   Okay.  From the Hand & Hand storage?

16  A.   Yes.

17  Q.   Okay.  And what did you do with what you retrieved

18  from storage?

19  A.   I delivered it to my attorney's office.

20  Q.   Okay, for what purpose?

21  A.   I guess they were shipping it to you or --

22  Q.   Okay, was that in response to the subpoena?

23  A.   Yes.

24  Q.   So, in other words, did you deliver them to your

25  attorney to give to the government?

```
1   A.   Correct, yes.

2   Q.   Okay.  Did you alter the contents of the checks that

3   you retrieved in any way?

4   A.   No.

5             MR. HERBERT:  Could we have Exhibit 130,

6   please.

7             (On screen.)

8   Q.   Okay.

9             MR. HERBERT:  Can we just page through this

10  Exhibit 130.

11            (Scrolls on screen.)

12  Q.   Okay.  Do you recognize what those documents are?

13  A.   Yeah, those were copies of the subscription of --

14  Q.   Okay, and does that relate to the e-mail that you

15  got from Mr. Hand on April 2nd?

16  A.   Yes.

17  Q.   And your notes?

18  A.   Yes.

19  Q.   Okay.

20            MR. HERBERT:  Going back to Exhibit 129, um,

21  that 4-2-12 e-mail from the defendant to you.

22            (On screen.)

23  Q.   When you got the checks in response to this e-mail,

24  what did you do with them?

25  A.   I would have attached them to this note and left
```

1   them on his deck.

2   Q.   Whose desk?

3   A.   Jehu.

4   Q.   Okay.  Have you had a chance to compare the checks

5   in Exhibit 130 to the copies of the checks from the

6   Green 4 Green bank records that we saw in Exhibit 113?

7   A.   Yes.

8   Q.   And did you see any differences between those

9   checks?

10  A.   No.

11  Q.   Okay.

12          MR. HERBERT:  Could we go to Exhibit 131,

13  please.

14          (On screen.)

15  Q.   All right.  Do you see this e-mail here?

16  A.   Okay.

17  Q.   Okay.  This e-mail's dated April 3rd, 2012.  How

18  long was that after the defendant's e-mail to you?

19  A.   The next day.

20  Q.   All right.  Do you recognize the sending e-mail

21  address on Exhibit 131?

22  A.   It's one of Jehu's addresses.

23  Q.   Okay.  And did you ever use that e-mail to send

24  things out as if you were Jehu Hand?

25  A.   No.

1   Q.  Um, do you know who "Ashley Dillon" is?

2   A.  Um, she's one of the owners, I think, of Pennaluna.

3   Q.  All right.  And do you recognize the cc e-mail

4   address?

5   A.  "Carlos Duque."

6   Q.  And who is "Carlos Duque"?

7   A.  An attorney here in Boston.

8   Q.  Okay.  Do you know what if any relationship he had

9   to the defendant?

10  A.  He was just a personal friend, I think.

11  Q.  Okay.  Do you know what if any involvement he had

12  with Crown Marketing?

13  A.  I don't know.

14  Q.  Okay.

15          MR. HERBERT:  So let's go to the attachments

16  to this e-mail, could we go to Page 8, please.

17          (On screen.)

18  Q.  Do you recognize this check?

19  A.  The William Wilkinson check.

20  Q.  Okay.

21          MR. HERBERT:  Can we show this page on the

22  left of the screen and Exhibit 130, Page 6, on the

23  right.

24          (On screen.)

25          MR. HERBERT:  I think you're able to --

```
 1    Q.   Let us know if you're able to read this?

 2    A.   Yeah, I can see it.

 3    Q.   You testified that Exhibit 130 was the canceled

 4    checks you retrieved from Hand & Hand storage and

 5    produced to the grand jury, correct?

 6    A.   Yeah.   The one on the right?

 7    Q.   Yeah.

 8    A.   Yes.

 9    Q.   Okay.   How does the check that was attached to the

10    defendant's e-mail to Ashley Dillon compare with the

11    check you received from the bank?

12    A.   Um, well it's missing all of the surrounding

13    notation from Wells Fargo.

14    Q.   Okay.

15    A.   The check itself is missing the address.

16    Q.   Okay.

17    A.   And I believe that's --

18    Q.   Whose address was on the original check?

19    A.   I believe that was my home address.   I can't quite

20    see it.

21    Q.   Okay.   Did you alter this check in any way before

22    giving it to the defendant?

23    A.   No.

24    Q.   And specifically did you remove your address from

25    this check before giving it to the defendant?
```

```
1    A.  No.
2    Q.  Do you know how your address came to be removed from
3    that check?
4    A.  No.
5    Q.  Are these two copies of the checks otherwise the
6    same?
7    A.  Um, yes.
8    Q.  In other words it's the same check number?
9    A.  Yes.
10   Q.  The same bank?
11   A.  Yes.
12   Q.  The same date?
13   A.  Yes.
14   Q.  Okay.
15           MR. HERBERT:  Can we go to, um, Page 9 of
16   Exhibit 131.
17           (On screen.)
18   Q.  So the next attachment to the defendant's e-mail to
19   Pennaluna was the Able Direct Marketing check.  Do you
20   see that?
21   A.  I do.
22   Q.  And we have that on the left of the screen in
23   Exhibit --
24           MR. HERBERT:  Could we have Exhibit 30, Page
25   1, on the right.
```

```
 1              (On screen.)
 2   Q.  All right.  What if any differences do you see in
 3   those two checks?
 4   A.  Um, okay, well again it's missing like the banking
 5   notations on it, and it's also signed by Katya, not
 6   myself.
 7   Q.  Okay.  Did you sign that document as "Katya"?
 8   A.  No.
 9   Q.  Okay.  Do you know how the change in that check
10   occurred?
11   A.  No.
12   Q.  Did you do anything to alter that check?
13   A.  No.
14   Q.  Are those two checks otherwise the same in terms of
15   the date and the check number?
16   A.  Um, they appear to be.  One is much more clean.
17   Q.  Uh-huh.  Okay.
18              MR. HERBERT:  All right, could we go to
19   Exhibit 131, Page 26, please.
20              (On screen.)
21   Q.  Okay.  So another attachment to the defendant's
22   e-mail to Ashley Dillon was this check, um, from
23   Bioclean Products, do you see that?
24   A.  Yes.
25   Q.  And again --
```

1          MR. HERBERT:  So could we have Exhibit 130,

2    Page 3, on the right of the screen, please.

3              (On screen.)

4    Q.  And again, can you compare the date and the check

5    numbers of those checks?

6    A.  Yeah, they're the same.

7    Q.  And what if any differences do you see between those

8    two checks?

9    A.  One is signed by Doris and one is signed by myself.

10   Q.  Okay.  And the original -- so the original check was

11   signed by you?

12   A.  Yes.

13   Q.  Okay.  Did Doris U. Turo even have signature

14   authority on this bank account?

15   A.  No.

16   Q.  Okay.  Did anyone other than you have signature

17   authority on any of these bank accounts?

18   A.  No.  Well Jehu had the signature on the two Hand &

19   Hand accounts.

20   Q.  Okay.  But otherwise?

21   A.  Otherwise, no.

22   Q.  Okay.  Could anyone other than you even have ordered

23   these checks?

24   A.  No.

25   Q.  So do you know who wrote that Doris U. Turo name

1   that's now on the signature line?

2   A.  That's my version of her signature, but I did not

3   sign that check.

4   Q.  Okay.  Did you alter your signature on the canceled

5   check obtained from the bank?

6   A.  No.

7   Q.  Did you have any role in altering your signature?

8   A.  No.

9   Q.  Do you know how that check got changed from the one

10  you gave to the defendant to the one that was sent to

11  Pennaluna?

12  A.  No.

13          MR. HERBERT:  Could we now go to Exhibit 132,

14  please.

15          (On screen.)

16  Q.  Do you see this document?

17  A.  Yes.

18  Q.  Okay.

19          MR. HERBERT:  Could we go to Page 5 of this,

20  please.

21          (On screen.)

22  Q.  All right.  Do you see this letter from Carlos Duque

23  to Mark Dillon?

24  A.  Uh-huh.

25  Q.  Responding on behalf of Crown, an April 18th, 2012

1    letter?

2    A.  Yeah.

3    Q.  The first item covers three missing checks?

4    A.  Okay.

5            MR. HERBERT:  Could we go to Page 6, please.

6            (On screen.)

7    Q.  The first attachment is a check from Annahuac

8    Management.

9            MR. HERBERT:  Could we show this on the left

10   of the screen and Exhibit 130, Page 2, on the right.

11           (On screen.)

12   Q.  All right.  What differences do you see between

13   these two checks?

14   A.  Um, the one on the left is signed by Yuri, which,

15   now that you show me this, he did have signature

16   authorization on this account.

17   Q.  Okay.  But did he sign this original check?

18   A.  No.

19   Q.  Okay.  And you testified that Exhibit 130, the one

20   on the right, is the original check, right?

21   A.  Right.  Right.

22   Q.  Okay.  And do you notice any differences with

23   respect to your address under the "Annahuac Management"

24   name?

25   A.  Yes, the address is missing on Yuri's.

1   Q.  Okay.  And on the one on the left, do you know that

2   to be Yuri Semenov's signature or is it just one that

3   you've associated with that name?

4   A.  Um, that looks like his signature.

5   Q.  Okay.  Did you change or alter this check in any way

6   before you gave it to the defendant?

7   A.  No.

8   Q.  Do you know how those changes occurred?

9   A.  No.

10  Q.  Okay.

11              MR. HERBERT:  Could we go to Page 8 of Exhibit

12  132, please.

13              (On screen.)

14  Q.  Okay.

15              MR. HERBERT:  Yeah, let's just stick with the

16  one on the left for now.

17              (On screen.)

18  Q.  Do you recognize this last attachment to the letter

19  from Mr. Duque?

20  A.  Yeah, that would be the Esthetics World check.

21  Q.  Okay.

22              MR. HERBERT:  Could we keep this on the left

23  and show Exhibit 130, Page 5, on the right, please.

24              (On screen.)

25  Q.  All right.  And what if any differences are there in

1    these two checks?

2    A.   So this one is missing the address as well and has

3    some like static above the outline of the check.

4    Q.   And by "this one" do you mean Exhibit 132, the one

5    on the left?

6    A.   The one on the left, yeah.  It's signed by Karen

7    Campo, and she's not a signer.

8    Q.   Okay.

9    A.   And the location of the bank is different as well.

10   Q.   Okay.  All right.  The original one is San Clemente,

11   California, is that right?

12   A.   Right, which is the correct one.

13   Q.   And the one on the -- the one on Exhibit 132 on the

14   left is San Diego?

15   A.   Correct.

16   Q.   And do you know if the one in Exhibit 132 is Karen

17   Campo Nuriega's actual signature?

18   A.   No, that's my signature of her name.

19   Q.   Okay.  But did you sign Karen Campo's name on the

20   original of this check?

21   A.   No.

22   Q.   Okay.  Do you notice any differences with respect to

23   the length of the line between the original check and

24   the one on the left, in 132?

25   A.   The line looks a little longer on the original.

1   Q.  Okay.  And do you notice any differences with

2   respect to the space between the authorized signature

3   and the signature line?

4   A.  The original has less space between it.

5   Q.  All right.  And otherwise is it the same check

6   number and date?

7   A.  Yeah.  Yes.

8   Q.  Did you play any role in altering this check before

9   you gave it to the defendant?

10   A.  No.

11   Q.  Do you have any idea how it came to be altered?

12   A.  No.

13   Q.  All right.

14         MR. HERBERT:  Could we go to Exhibit 202,

15   please.

16         (On screen.)

17   Q.  All right.  Now, do you see in the top row of red

18   boxes, the third from the left is one for "Arrakis

19   Financial"?

20   A.  Okay.

21   Q.  Do you recognize that name, "Arrakis Financial"?

22   A.  Yes, from having typed it.

23   Q.  Okay.  How do you recognize the name other than

24   that?

25   A.  Just from having typed it.

1  Q.  Okay.  Do you know what if any connection it has to

2  the defendant?

3  A.  I don't know the connection.

4  Q.  Okay.  And then, um, do you see, third from the

5  right, a indication of a company called "Wohlieichender

6  Blumgarten"?

7  A.  It's missing an "e," but, yes.

8  Q.  Okay.  And do you recognize that?

9  A.  Yes, from having typed it.

10  Q.  Okay.  And who would have asked you to type, um,

11  documents related to Arrakis or Wohlieichender

12  Blumgarten?

13  A.  Jehu.

14  Q.  Okay.  Um -- all right.

15         MR. HERBERT:  We can close that document.

16         (Takes off screen.)

17  Q.  Are you familiar with a company called "Diluth

18  Venture Capital Partners"?

19  A.  I recognize it, yes.

20  Q.  And what do you recognize it to be?

21  A.  A shell of Jehu's.

22  Q.  Okay.  Do you know if Igor Produn had, um, any

23  involvement with Diluth Venture Capital Partners?

24  A.  Not that I know of.

25  Q.  Okay.  Have you ever heard of something call "JK

1    Advisors Hedge Fund"?

2    A.  I have.

3    Q.  Okay, what is that?

4    A.  A shell.

5    Q.  Okay.  All right.  And how about "JK Advisors, LLC"?

6    A.  It's familiar.

7    Q.  Okay.  Familiar?

8    A.  I don't know anything about it.

9    Q.  Okay.  But is it familiar from the context of your

10   work?

11   A.  Yeah, just the name.

12   Q.  Okay.

13              MR. HERBERT:  Could we show Exhibit 16,

14   please, um, Page 2.

15              (On screen.)

16   Q.  Okay.  Do you recognize what's in this exhibit?

17   A.  These are corporation documents for JK Advisors.

18   Q.  Okay.  And under Section 5 --

19              MR. HERBERT:  Could you blow it up.

20              (Enlarged.)

21   Q.  -- who does that indicate as the manager of JK

22   Advisors?

23   A.  Jehu.

24   Q.  And did you have anything to do with preparing this

25   document?

1   A.  It's 50/50 I could have done it.  This he could have

2   done, because it's online.

3   Q.  Okay.

4           MR. HERBERT:  Your Honor, just for the record

5   I note that these are certified copies of records from

6   the Wyoming Secretary of State.

7           THE COURT:  Well they are what they are.

8           MR. HERBERT:  Yes, sir.

9       All right, could we go to Exhibit 134, please.

10          (On screen.)

11  A.  This is Nevada, not Wyoming.

12  Q.  Oh, Nevada.  I'm sorry.  Oh, yes.

13      Do you recognize what's in 134?

14  A.  This is a brokerage statement for Esthetics World.

15  Q.  All right.

16          MR. HERBERT:  And if we could just go to Page

17  47 of this, please.

18          (On screen.)

19  Q.  Okay.  Do you see what statement period this relates

20  to?

21  A.  August of 2012.

22  Q.  Okay.

23          MR. HERBERT:  And Page 38, please.

24          (On screen.)

25  Q.  What period was this?

1    A.   September of 2012.

2              MR. HERBERT:   And Page 31, please.

3              (On screen.)

4    Q.   And this?

5    A.   October of 2012.

6    Q.   Okay.

7              MR. HERBERT:   And Page 22, please.

8              (On screen.)

9    A.   November of 2012.

10   Q.   Okay.

11             MR. HERBERT:   Page 10.

12             (On screen.)

13   A.   December of 2012.

14   Q.   Okay.  All right.  What if any involvement did you

15   have with respect to these brokerage statements from

16   Esthetics World?

17   A.   I would receive them via mail and file them in the

18   hardcopy.

19   Q.   Okay.

20             MR. HERBERT:   Could we go to Page 40 of this

21   exhibit, please.

22             (On screen.)

23   Q.   Do you see under "Portfolio Summary," um, an

24   indication "Shares held by Crown Marketing, 40,000

25   shares, and Greenway Technology, 1 million shares" --

1   or, I'm sorry, "992,000 shares"?

2   A.  Yes.

3   Q.  Okay.  And what was your understanding as to what

4   that reflected?

5   A.  Um, it means Esthetics World owned those shares and

6   had deposited them in the brokerage account.

7   Q.  Okay.

8           MR. HERBERT:  And if we could go to Page 41.

9           (On screen.)

10  Q.  Do you see under "Buy/sell transactions," um, shares

11  of Greenway Technology that were sold out of that

12  account on September 12th of 2012?

13  A.  Yes.

14  Q.  Do you have any knowledge as to who made the trading

15  decisions for this account?

16  A.  Jehu.

17  Q.  Okay.  And what would happen to the proceeds of

18  sales of stock like that out of an account like this?

19  A.  We would request a wire and it would be, um,

20  deposited into the Bank of America, Esthetics World

21  account.

22  Q.  Okay.

23          MR. HERBERT:  Could we go to Page 33, please.

24          (On screen.)

25  Q.  And how many shares of Crown Marketing are indicated

```
 1    in the account as of this date?
 2    A.  379,300.
 3    Q.  Okay.  And this was the statement for October of
 4    2012, is that right?
 5    A.  Yes.
 6    Q.  Okay.
 7              MR. HERBERT:  On Page 34.
 8              (On screen.)
 9    Q.  Do you see any indication of sales of Crown stock on
10    October --
11    A.  16,000.
12    Q.  Okay.  And just the rest of the question was October
13    31st of 2012?
14    A.  Okay.
15    Q.  Would those proceeds have been handled in the same
16    way?
17    A.  Yes.
18    Q.  Okay.
19              MR. HERBERT:  And could we go to Page 24,
20    please.
21              (On screen.)
22    Q.  All right.  Do you see more sales of Crown stock in
23    November of 2012?
24    A.  Yes.
25              MR. HERBERT:  And on Page 25.
```

```
 1              (On screen.)
 2     Q.  Do you see more sales of Greenway Technology between
 3     November 26th and November 30th?
 4     A.  Yes.
 5              MR. HERBERT:  Could we go to Page 12, please.
 6              (On screen.)
 7     Q.  Under the "Portfolio Summary" for December of 2012,
 8     do you see any shares of Greenway Technology remaining
 9     in that account?
10     A.  No, I don't.
11     Q.  Okay.
12              MR. HERBERT:  Could we go to Page 13.
13              (On screen.)
14     Q.  Did you see more sales of Greenway Technology in
15     December?
16     A.  Yes.
17              MR. HERBERT:  And could we go to Page 14.
18              (On screen.)
19     Q.  And more sales of Greenway Technology?
20     A.  Yes.
21     Q.  Okay.
22              MR. HERBERT:  And if we could back out of that
23     and just on that same page, 14.
24              (On screen.)
25     Q.  Do you see an indication of a wire transfer below
```

```
 1    the sales of Greenway Technology?
 2    A.   Yes.
 3    Q.   Do you know what it means when that amount is under
 4    debit instead of credit?
 5    A.   It's being deducted from the account.
 6    Q.   Okay, so that's a wire transfer out of the account?
 7    A.   Correct.
 8    Q.   All right.  What if any involvement did you have
 9    with respect to wire transfers out of these accounts?
10    A.   Um, I probably requested it.
11    Q.   Okay.  On whose instructions?
12    A.   Jehu.
13    Q.   Do you know where the money went?
14    A.   Bank of America, the Esthetics World account.
15    Q.   Okay.
16               MR. HERBERT:  On Page 15 of this document.
17               (On screen.)
18    Q.   Do you see an indication of a wire transfer of
19    $14,200?
20    A.   Yes.
21    Q.   Okay.  All right.
22               MR. HERBERT:  Could we go to Page 3 then,
23    please.
24               (On screen.)
25    Q.   All right.  For "January," do you see, under
```

1   "Portfolio Summary," that the Crown shares are down to

2   20,000?

3   A.  Yup.

4   Q.  And below that, under "Account Activity," do you see

5   indications of sales or Crown stock in January?

6   A.  Yes.

7            MR. HERBERT:  And could we go to Page 4.

8            (On screen.)

9   Q.  Do you see under "Funds Paid and Received" --

10  A.  Yes.

11  Q.  -- an indication of two wire transfers out of that

12  account in the amounts of $4,100 and $74,000?

13  A.  Yes.

14  Q.  Do you know where those were wired to?

15  A.  The Bank of America account.

16  Q.  Okay.

17           MR. HERBERT:  Could we go to Exhibit 135,

18  please.

19           (On screen.)

20  Q.  Do you recognize that?

21  A.  It looks like, um, username, password, you know

22  information, um, details for the, um, Merrimack account.

23  Q.  Okay.  And do you know which Merrimack account this

24  was for?

25  A.  I don't.  Although seeing "Barraquilla," I would

1    think, um -- I would think Bioclean.  But I don't know.

2    Q.  Okay.  And why do you associate "Barraquilla" with

3    Bioclean?

4    A.  I associate Doris with "Barraquilla."

5    Q.  That's "Doris," the "Doris" you mentioned before?

6    A.  Yeah.

7    Q.  Okay.  What if any use did you make of this

8    information?

9    A.  None.

10   Q.  None.  And do you know who did use this information

11   to log into the Esthetics World account at Merrimack?

12   A.  No.

13   Q.  Okay.  Who else worked at the firm besides you?

14   A.  Just Jehu.

15   Q.  Okay.

16           MR. HERBERT:  Could we go to Exhibit 136,

17   please.

18           (On screen.)

19   Q.  And what is this?

20   A.  This is a bank statement from Esthetics World, Bank

21   of America.

22   Q.  Bank of America.  And was your involvement with

23   these bank records the same as with the others?

24   A.  Yes.

25   Q.  Okay.

1           MR. HERBERT:  Page 1.

2           (On screen.)

3   Q.  On Page 1, whose address is that for Esthetics

4   World?

5   A.  That's my home address.

6   Q.  In the bottom of the page, which period is this for?

7   A.  January of 2013.

8   Q.  Okay.  And to the right do you see the beginning

9   balance and the amount of deposits into that account?

10  A.  Yes.

11  Q.  All right.

12          MR. HERBERT:  Can you just blow that up, the

13  beginning balance, and then 1,149, and then the deposits

14  into the account of 78,100.

15          (Enlarged.)

16  A.  Yes.

17  Q.  All right.

18          MR. HERBERT:  Go to Page 2, please.

19          (On screen.)

20  Q.  Okay.  Do you see an indication of two deposits into

21  that account by wire transfer --

22  A.  Yes.

23  Q.  -- of $4,100 and $74,000?

24  A.  Yes.

25  Q.  How if at all did those amounts relate to the last

```
 1    wire transfers we saw at the Merrimack brokerage
 2    accounts?
 3    A.   They're the same amounts.
 4    Q.   Okay.
 5              MR. HERBERT:  Can we go to Page 2, please.
 6              (On screen.)
 7    Q.   Do you see on this page, do you see a series of
 8    withdrawals from that account by teller/cash withdrawal
 9    and transfer to check?
10    A.   Yes.
11    Q.   Do you know who made those withdrawals?
12    A.   Me.
13    Q.   All right.  On whose instructions?
14    A.   Jehu.
15              MR. HERBERT:  Can we go to Page 5.
16              (On screen.)
17    Q.   At the bottom of the page, what period is this for?
18    A.   February of 2013.
19    Q.   Okay.  And the beginning balance was $63,569?
20    A.   Yes.
21    Q.   And what was the amount of the debit withdrawals
22    from that account in February?
23    A.   62399.
24    Q.   Okay.
25              MR. HERBERT:  Could we go to Page 6, please.
```

1                  (On screen.)

2     Q.   Okay.  Do you see here another series of cash

3     withdrawals and transfers of checks?

4     A.   Yes.

5     Q.   And what if any involvement did you have with those

6     transactions?

7     A.   I would have done them.

8     Q.   Okay.  On whose instructions?

9     A.   Jehu.

10                 MR. HERBERT:  Could we go to Exhibit 137,

11    please.

12                 (On screen.)

13    Q.   All right.  Do you recognize what's on Exhibit 137?

14    A.   This is a, um, Quicken-generated register.

15    Q.   Okay.  And from where?

16    A.   From the Esthetics BVA account.

17    Q.   All right.  And what involvement did you have in

18    creating this check register?

19    A.   Well I kept the records of each of these companies

20    in the Quicken system.  I could have produced this

21    register, but Jehu could have also produced it.  I don't

22    know.

23    Q.   Okay.

24                 MR. HERBERT:  Could we just blow up the text

25    of this, see if we can make this a little bit bigger.

1              (Enlarged.)

2   Q.   Could you just go and walk us through and explain

3   each of those entries starting with the wire transfer in

4   of $74,000?

5   A.   Yeah, so that first would be a wire in from the

6   brokerage account and the wire fee.  Then the $1,000

7   cash?  I don't know what that second wire fee would be,

8   but would be probably for the $4100.

9   Q.   Let me just stop you there.  The $1,000 cash was a

10  withdrawal?

11  A.   Yes, it produces a cash withdrawal.

12  Q.   Okay.

13  A.   There's no indication of where it went, so I'm not

14  sure.

15  Q.   Okay.

16  A.   "PR Newswire" is a news release firm.

17  Q.   Okay.

18  A.   The transfer to Jackson would have been a cash

19  transfer at the counter.  Same with the Cozumel.

20  Q.   And, I'm sorry, let me just stop you.  What is

21  "Jackson Corporate Consultants"?

22  A.   It was another account we had, um, a bank account.

23  Q.   Okay.

24  A.   "Cozumel" is the same, another bank account.

25  Q.   Okay.

1   A.   The withdrawal of cash was a Western Union to Igor

2   Produn.

3   Q.   Okay.

4   A.   The bank service charge.  The "Wyoming Corporation"

5   would be an incorporation charge for Blue Star -- I

6   think it was "Blue Star Technologies."

7   Q.   Uh-huh.

8   A.   "Loan Coyote" is a company controlled by Adam Hand.

9   Q.   Okay.

10   A.   And they had an account at Bank of America, so it

11   would have been a cash transfer.

12   Q.   Okay.

13   A.   Or, no, that's a check.  It was a check.  So

14   I probably deposited it.  No, I'd probably give it to

15   Adam for deposit.  Then two checks to Adam.  Um, a check

16   to John Dale, which was the -- his daughter is Victoria,

17   so he was paying her rent.

18   Q.   John Dale was Jehu's landlord?

19   A.   No, Victoria's.  His daughter's.

20   Q.   His daughter's landlord?

21   A.   Yes.

22   Q.   Okay.

23   A.   A stock transfer would have probably been a transfer

24   of shares.  The transfer to Bioclean would have been a

25   counter transfer, um, in cash.

1    Q.   Into the Bioclean?

2    A.   Into the Bioclean.

3    Q.   Okay.

4    A.   Um, a withdrawal -- so all that in Katerina, those

5    would have been Western Unions.

6    Q.   Uh-huh.

7    A.   A withdrawal for cash was myself.

8    Q.   Uh-huh.

9    A.   A check to Victoria, um, probably for school,

10   because that's his daughter.  And again a stock

11   transfer.  And then Carlos Duque.

12   Q.   Okay.  Now just go back on those companies.

13        "Jackson Corporate Consultants," what connection

14   did that company have to the defendant?

15   A.   He controlled it.

16   Q.   Okay.  And what about "Cozumel"?

17   A.   The same, he controlled it.

18   Q.   Do you know the full name of "Cozumel"?

19   A.   "Cozumel Yacht Brokers."

20   Q.   All right.

21        MR. HERBERT:  Could we go to Exhibit 138,

22   please.

23        (On screen.)

24   Q.   Do you recognize this document?

25   A.   Yeah, this is my writing.

1    Q.   And what's it?

2    A.   It's a breakdown of the funds from the Esthetics

3    World sale and where all that money was supposed to go.

4    Q.   Okay.  And where did you get the information that

5    you put into these notes?

6    A.   Jehu.

7    Q.   Okay.

8              MR. HERBERT:  Are you able to show this

9    document on the left of the screen and Exhibit 137 on

10   the right?

11             (On screen.)

12   Q.   All right.  Can you just take us through your notes,

13   um, in Exhibit 138 and explain how if at all they relate

14   to what we just saw in Exhibit 137?

15   A.   Um, so the 74 is the deposit, it's the wire fee.

16   Q.   Uh-huh.

17   A.   Are you matching them right now?  Okay.  So that's

18   the deposit.  The next one is the wire fee.

19   Q.   Okay.

20   A.   The 1784 is PR Newswire.

21   Q.   Okay.

22   A.   The 20,500 was, um, attributed to Jehu, but it

23   doesn't go anywhere yet.

24   Q.   What do you mean it's attributable to Jehu?

25   A.   Like if I was making columns, that would stay in

1    Jehu's column, and then it would be disbursed upon his
2    instructions.
3    Q.  Okay.
4    A.  For now we were dealing with a balance of 51704, so
5    425 goes to Ross to incorporate, it looks like, Blue
6    Star.
7    Q.  Okay.
8    A.  20,500 went to Loan Coyote.  2 to Adam Hand of
9    10-2-15.  And then the remaining was to be held for
10   Jeremiah's benefit, with instructions to come later.
11   Q.  Okay.  And who is "Jeremiah"?
12   A.  Jeremiah Hand.  To his brother.
13   Q.  Okay.  All right.
14              MR. HERBERT:  Could we go to Exhibit 139,
15   please.
16              (On screen.)
17   Q.  Do you recognize this?
18   A.  Esthetics World's bank statement for December of
19   2012.
20   Q.  Okay.  And how much did it receive in deposits and
21   credits that month?
22   A.  30,700.
23   Q.  And how much were the withdrawals and the debits?
24   A.  31695.
25   Q.  Okay.

1        MR. HERBERT:  Could we go to Page 2, please.

2        (On screen.)

3    Q.  Do you see two deposits in that page from wire

4    transfers of $16,500 and $14,200?

5    A.  Yes.

6    Q.  Do you know what the source of those wires was?

7    A.  I'm assuming the sale of stock from their brokerage

8    account.

9    Q.  Okay.

10       MR. HERBERT:  Could we go back to Exhibit 134,

11   Page 13, please.

12       (On screen.)

13   Q.  You testified this was the Merrimack statement

14   showing sales of Greenway Technology in December,

15   correct?

16   A.  Yes.

17       MR. HERBERT:  And on Page 14.

18       (On screen.)

19   Q.  It's showing more sales of Greenway Technology and a

20   wire transfer out of $16,500 on 12-7-12, correct?

21   A.  Yes.

22       MR. HERBERT:  And on Page 15.

23       (On screen.)

24   Q.  Another wire out, 14,200, on 12-24-12, is that

25   correct?

1    A.   Yes, those match.

2    Q.   Okay.

3              MR. HERBERT:   And can we go back to Exhibit

4    139, Page 2.

5              (On screen.)

6    Q.   Do you see a series of cash withdrawals and other

7    debits?

8    A.   Yes.

9    Q.   Do you know who made those withdrawals?

10   A.   Me.

11   Q.   Okay.  By the way, when you would make a cash

12   withdrawal from the bank account, what would you do with

13   the cash?

14   A.   It depends upon his instructions.  So sometimes I

15   would just transfer it to one of the other accounts,

16   sometimes I'd give them cash.

17   Q.   Okay, give who cash?

18   A.   Actually I don't know that I ever gave Jehu cash.  I

19   oftentimes gave Adam cash, but I don't think I ever gave

20   Jehu cash.  It always went to another account.

21   Q.   Okay.  What type of account?

22   A.   A bank account that we had.

23   Q.   Okay.

24             MR. HERBERT:   And could we go to Exhibit 140,

25   please.

1              (On screen.)

2    Q.   All right.  Do you recognize this?

3    A.   It's a bank statement for Cozumel Yacht Brokers.

4    Q.   Okay.  And you testified that Cozumel Yacht Brokers

5    was another of the defendant's companies?

6    A.   Yes.

7    Q.   And again is that your home address for Cozumel

8    Yacht Brokers?

9    A.   Yes.

10   Q.   And in the top right, what was the period for this

11   statement?

12   A.   That is January 2010.

13   Q.   Okay.  And under "Deposits and Credits"?

14   A.   $3500.

15   Q.   Okay.  Do you see, um -- actually, I'm sorry.

16              MR. HERBERT:  Can we go to Page 101, we can do

17   that.

18              (On screen.)

19   Q.   All right.  Sorry, what was the period for this

20   statement on Page 101?

21   A.   Sorry, December 2012.

22   Q.   Okay.  And under "Deposits and Credits" on this, do

23   you see a deposit of $1700?

24   A.   Yes.

25   Q.   Okay, on 12-28-2012?

1    A.   Uh-huh.

2    Q.   Do you know what the source of that deposit was?

3    A.   No.

4    Q.   Okay.

5              MR. HERBERT:   Can we go back to Exhibit 139,

6    Page 2.

7              (On screen.)

8    Q.   All right.  Do you see a transfer out of the

9    Esthetics World account in that amount on 12-28?

10   A.   Yes, and on this statement I can see that it went to

11   Cozumel because that was the -- that's the numbers of

12   Cozumel's bank account, "2113."

13   Q.   Okay.  And, um --

14             MR. HERBERT:   Back on Exhibit 40, Page 101.

15             (On screen.)

16   Q.   The same number?  Do you see that?

17   A.   Yes.

18   Q.   Okay.

19             MR. HERBERT:   Could we go to Exhibit 141,

20   please.

21             (On screen.)

22   Q.   Okay.  Do you recognize this?

23   A.   Um, the Bank of America statement for MX Mining.

24   Q.   Who's "MX Mining"?

25   A.   A company of Jehu's.

1    Q.   And the address was your address?

2    A.   My home address.

3    Q.   Okay.  Who created this account?

4    A.   I did.

5    Q.   Okay.  Bottom of Page 1, what was the period for

6    this statement?

7    A.   December of 2012.

8    Q.   And on Page 2, do you see a series of deposits into

9    that account?

10   A.   Yes.

11   Q.   And do you know where these came from?

12   A.   No.

13   Q.   Okay.  Do you see a deposit of $19,471 on 12-28?

14   A.   Yes.

15            MR. HERBERT:  Could we go back to Exhibit 139,

16   the bank statements from Esthetics World.

17            (On screen.)

18            MR. HERBERT:  Could you go to Page 2.

19            (On screen.)

20   Q.   Do you see a debit of that same amount on 12-28?

21   A.   Yes, sir.

22   Q.   Okay.  And what involvement, if any, did you have in

23   making those transfers?

24   A.   Yes, I would have done them.

25   Q.   Okay.

1          MR. HERBERT:  All right.  We can take off this

2     document.

3              (Takes off screen.)

4     Q.  Now, Ms. Peterson, as the assistant to the

5     defendant, how did you maintain hardcopy records for the

6     companies, um, that you and the defendant were working

7     on?

8     A.  We kept two copies of everything, one within the

9     client file, and one chronologically.

10    Q.  Okay.  And where actually were the company files

11    kept?

12    A.  Onsite until the cabinets were too full and then

13    they were sent out to storage.

14    Q.  Okay.  And what if anything changed when the

15    defendant moved to Antigua and you were working from

16    home?

17    A.  At that point everything was sent to outside storage

18    except for banking and brokerage, I kept on hand.

19    Q.  Okay.  And how did you maintain electronic records

20    for these companies?

21    A.  Um, within the system, um, it went under their claim

22    folder.

23    Q.  Okay.

24    A.  We had a folder for each client.

25    Q.  Okay.  My question is, I guess, is did you keep

1    electronic records with respect to these companies?

2    A.   Yes, as much as we had them.   Yes.

3    Q.   Okay.   And who had access to that drive that you

4    kept those records on?

5    A.   Jehu and myself.

6    Q.   Okay.   And what was saved on that hard drive?

7    A.   Everything related to the clients.

8    Q.   Okay.   And does -- so would that include everything

9    that you produced in electronic form?

10   A.   Yes.

11   Q.   And what about anything you received electronically?

12   A.   Yes, if we received it electronically.   Yes.

13   Q.   All right.   And how were those electronic files

14   organized?

15   A.   By client and also chronologically.

16   Q.   And by "client," you mean by the company names?

17   A.   Yes.   Yes.

18   Q.   And, um -- so, um, that was true with respect to the

19   hardcopies as well?

20   A.   Yes.

21   Q.   Okay.   And what if the paperwork related to more

22   than one company, what would you would do?

23   A.   I did my best to determine which one it went for,

24   but if it wasn't clear, I would put it in both files.

25   Q.   Okay.   All right.

1          What if anything changed with respect to the

2     electronic files that you had when the defendant moved

3     to Antigua?

4     A.  Um, until that point we had a physical hard drive

5     where everything routed to, and once he left the country

6     it went to an online storage, um, Dropbox.

7     Q.  Okay, Dropbox.  Who created the Dropbox account?

8     A.  Jehu.

9     Q.  And was there a login name for that Dropbox account?

10    A.  Yes.

11    Q.  Do you recall what that was?

12    A.  I think it was "Jehu Hand."  I don't recall.

13    Q.  Okay.  Was there more than one login name?

14    A.  No.

15    Q.  Okay.  And was there a password?

16    A.  Yes.

17    Q.  Okay.  And to your knowledge who had access to that

18    account?

19    A.  Jehu and myself.

20    Q.  Did you ever pass that login information to anyone

21    else?

22    A.  No.

23    Q.  To your knowledge did the defendant?

24    A.  No.

25    Q.  And about when was that Dropbox account created?

1    A.   Sometime before he left in July of 2012.

2    Q.   Okay.  And what happened to all the documents from

3    the server?

4    A.   I don't know, they're not there.

5    Q.   Well when -- when the Dropbox account was created,

6    what happened to the documents that were on your shared

7    drive?

8    A.   They were copied over.

9    Q.   To the Dropbox?

10   A.   Right, so we had two versions of it, I guess.

11   Q.   Okay.  Did you participate in that or just him?

12   A.   No, he would have done that.

13   Q.   Okay.  All right.

14        After the Dropbox account was created in 2012, did

15   you have occasion to log into that Dropbox account

16   between 2012 and 2015?

17   A.   Yes, often.

18   Q.   Okay.  And between 2012 and 2015, did you notice any

19   files missing from what you had on the server?

20   A.   Um, yes.

21   Q.   Well between 2012 and 2015, did you notice any

22   differences between your previous shared drive records

23   and what was on the --

24   A.   Oh, no, they were identical.

25   Q.   Okay.  Were there subfolders within the company

1    folders?

2    A.  Yes.

3    Q.  Okay.  And how were those organized?

4    A.  Um, the same as before, each company had its own

5    directory and within them they would have letters or

6    correspondence or S-1s, or 10Qs.

7    Q.  All right.  And roughly how many company folders

8    were there in the Dropbox account?

9    A.  Hundreds, if not thousands.

10   Q.  Okay.  Do you know whether anyone other than you and

11   the defendant ever accessed the Dropbox account?

12   A.  I don't believe so.  Well for a time his daughter

13   was working with us and she would have had access.

14   Q.  Okay.

15   A.  But, no, it was just Jehu and I.

16   Q.  Okay.  What was his daughter doing?

17   A.  Olivia?  Just secretarial work.  An assistant.

18   Q.  How old was she?

19   A.  Um, like 18ish.

20   Q.  Okay.  Did she have any substantive involvement with

21   those companies?

22   A.  No.  No.

23   Q.  At some point did you find out the defendant had

24   been arrested?

25   A.  Yes.

1  Q.  How did you, um -- well, strike that.  About when
2  did you find that out?
3  A.  October or November of 2015.
4  Q.  And how did you find that out?
5  A.  A phone call from Jehu.
6  Q.  Okay.  And what did he say on that call?
7  A.  That he had been arrested at customs and he gave me
8  some tasks to, you know, take care of immediately.
9  Q.  Okay.  What tasks did he give you, if you recall?
10 A.  I only recall that he asked me to contact his
11 daughter and his wife and that he would be in contact
12 with me.
13 Q.  Okay.  After this were you served with a grand jury
14 subpoena?
15 A.  Yes.
16 Q.  Where was that?
17 A.  At my home.
18 Q.  And by whom were you served with that subpoena?
19 A.  Um, two FBI agents.
20 Q.  Okay.  And then just "Yes" or "No," did you have a
21 conversation with the agents?
22 A.  Yes.
23 Q.  All right.
24          MR. HERBERT:  Could we have Exhibit 142,
25 please.

1           (On screen.)

2     Q.  Do you recognize that document?

3     A.  Yes, that was the subpoena.

4     Q.  Is that the grand jury subpoena you were served

5     with?

6     A.  Yes.

7     Q.  Are you able to recall the date that the agents came

8     to your house to serve that subpoena?

9     A.  No.

10    Q.  Okay.  What if any travel did you have after

11    receiving the call that the defendant had been arrested,

12    um, and before this date?

13              THE COURT:  I don't -- ask the question again?

14              MR. HERBERT:  I'll rephrase it.

15    Q.  What if any travel did you have, um, soon after

16    receiving the call that the defendant had been arrested?

17    A.  I went to Antigua.

18    Q.  For what purpose?

19    A.  To pick up his daughter.

20    Q.  All right.  And when in relation to the defendant's

21    arrest did you make that trip?

22    A.  Um, within the week, I think.

23    Q.  Okay.  And about how long did that trip last?

24    A.  A day or two.  It was quick.

25    Q.  All right.  What did you do immediately after

1   receiving the subpoena from the FBI agents?

2   A.   I called Jehu.

3   Q.   Okay.  And, um, what did you say?

4   A.   That I just had two FBI agents at my door and, um,

5   "What am I supposed to do?"

6   Q.   Okay.  Did you tell him anything about what the FBI

7   agents were at your house for?

8   A.   No.

9   Q.   Did he ask?

10  A.   No.

11  Q.   Um, what was your purpose in calling him?

12  A.   "Why are they here?  What am I supposed to do?"

13  Q.   Okay.  And what was his response?

14  A.   He advised me to get an attorney.

15  Q.   Okay.  And did he advise you of anything else?

16  A.   Not that I recall.

17  Q.   Okay.  Do you recall him advising you to comply with

18  the subpoena?

19  A.   Oh, yeah, yes, he did say, um, "To do as

20  instructed."

21  Q.   Okay.  What if anything were you able to observe

22  about his tone on the phone?

23  A.   It was the same as always.

24  Q.   Okay.  I'm directing your attention to March of

25  2016.  What if any travel plans did you make?

1    A.   Um, I arranged to come here.

2    Q.   And by "come here," what did you mean?

3    A.   I was directed to meet with agents here.

4    Q.   Okay.  By whom were you directed to do that?

5    A.   Well, by subpoena.

6    Q.   All right.  Do you recall specifically whether that

7    was a meeting to testify in response to the subpoena or

8    having a separate meeting with --

9    A.   I think it was a separate meeting.

10   Q.   Okay.  And, um, what was the purpose of that

11   separate meeting supposed to be, as you understood it?

12   A.   I guess to find out what I know.

13   Q.   Okay.  Um, when were you first notified that

14   prosecutors would like to meet with you?

15   A.   (Pause.)  I think it was February or March --

16   February maybe.

17              MR. HERBERT:  Could we just have Exhibit EN

18   for the witness.

19              (On witness screen.)

20   Q.   All right.  Can you take a look at the, um, the

21   portion of that page that begins sort of in the middle

22   down, um, and just read that to yourself.

23   A.   (Reads.)  Okay.  I recognize it.

24   Q.   Okay.  Does that refresh your memory as to when you

25   were first notified that the prosecutors would like to

1    meet with you?

2    A.  Yup, March 2nd.

3    Q.  Of what year?

4    A.  Of 2016.

5    Q.  Okay.  And what if any arrangements did you make

6    after March 2nd, 2016 to come to Boston to meet with the

7    prosecutors?

8    A.  Um, well I didn't make them, they were made for me.

9    Q.  Okay.  And were you privy to those plans?

10   A.  Yeah, they asked for availability.

11   Q.  Okay.  And are you able to recall exactly when those

12   started, when those plans started?

13   A.  March 2nd or 3rd.

14   Q.  Okay.

15            MR. HERBERT:  Could we just have Exhibit EO

16   for the witness.  (On screen.)  Could we go to Page 8 of

17   this.  (On screen.)  Okay.

18   Q.  And taking a look at that, does that refresh your

19   memory at all as to exactly when you and your attorney

20   started making plans to come to Boston?

21   A.  Yeah, March 2nd and 3rd.

22   Q.  Okay.  And what was the date or dates that were

23   being mapped out for your meeting in Boston?

24   A.  January -- sorry, the 15th and 16th.

25   Q.  Of what month?

1    A.   Of March.

2    Q.   Okay.  Now at this point had you remained in

3    communication with the defendant?

4    A.   Um, yeah, I was still doing a couple of things for

5    him.

6    Q.   Okay, and why were you still in communication with

7    him?

8    A.   I was still taking care of some banking and menial

9    things, um, I still had all the office stuff at my

10   house.

11   Q.   Uh-huh.

12   A.   Just -- um, nothing of substance, just taking care

13   of loose ends.

14   Q.   All right.  And when you say "banking stuff," what

15   are you talking about?

16   A.   All the accounts that were open, I was the only

17   person on the accounts, so I had to close the account

18   for him, pack everything up, ship it off.

19   Q.   Okay.  Did you do anything with respect to money

20   from those accounts around this time?

21   A.   I don't recall.  There really wasn't anything in

22   there, so it would be menial.

23   Q.   Okay.  Do you recall whether or not you told the

24   defendant, in any of those communications, that you had

25   plans to go to Boston and meet with prosecutors?

```
 1    A.   I don't recall.
 2    Q.   Okay.
 3              MR. HERBERT:   Could we go to Exhibit 143,
 4    please.
 5              (On screen.)
 6    Q.   All right.  Do you recognize what these are?
 7    A.   That's the T-Mobile phone record.
 8    Q.   Okay.  And what was your work phone number in March
 9    of 2016?
10    A.   Um, 949-331-2909.
11    Q.   Okay.
12              MR. HERBERT:   Is this exhibit coming up for
13    others?
14              THE WITNESS:   I see it.
15              MR. HERBERT:   Yeah, you see it, but it's not
16    coming up for the jurors?  Yes, for the jurors.  Yes.
17    It's 143.
18              (On screen.)
19              MR. HERBERT:   Okay.
20    Q.   So -- I'm sorry, what was your phone number again,
21    your work phone?
22    A.   The 3312109.
23    Q.   Okay.  Do you recognize the number 714-293-9080?
24    A.   That's my personal cell.
25    Q.   Okay.
```

1          MR. HERBERT:  Could we go to Page 18, please.

2              (On screen.)

3    Q.  All right.  Do you see a call on March 3rd, 2016 at

4    16:18 UTC?

5    A.  (Looks.)  Okay.

6    Q.  All right.  And if I were to tell you that UTC is 7

7    hours ahead of Pacific Standard Time, what time would

8    that be?

9    A.  9:18.

10   Q.  Okay.  Do you see that call outgoing to

11   626-464-4313?

12   A.  Uh-huh.  Yes.

13   Q.  Okay.  Do you know whose number that was?

14   A.  Well I think because -- because you discussed this

15   before, it's one of Jehu's numbers.

16   Q.  How were you able to determine that?

17   A.  I looked in my phone.

18   Q.  Okay, and what was the designation in your phone for

19   that number?

20   A.  "Jehu NC," meaning North Carolina.

21   Q.  Okay.  And where was he in March of 2016?

22   A.  In North Carolina.

23   Q.  Okay.  And how long did that call last?

24   A.  Um, 114 seconds.

25   Q.  Okay.  Do you know why you called the defendant that

1   morning?

2   A.  No.

3   Q.  Okay.  Then at 16:25 UTC, there's an incoming call

4   from the defendant's number, do you see that?

5   A.  Yes.

6   Q.  Do you recall what you discussed with the defendant

7   in those two calls?

8   A.  No.

9   Q.  Okay.  What if any practice did you have at the time

10  about informing the defendant when you would be out of

11  town?

12  A.  Yes, I would tell him when I was unavailable.

13  Q.  Okay.  Did you tell him in advance when you expected

14  to be unavailable?

15  A.  Um, within days.

16  Q.  Okay.  And what was the purpose of that?

17  A.  Because I wasn't available to him.

18  Q.  Okay.

19          MR. HERBERT:  And could we go to Exhibit 143,

20  Page 19.

21          (On screen.)

22  Q.  All right.  Do you see an incoming call from the

23  defendant's number at what would be 10:32 a.m., um, so

24  17:32 a.m. UTC, um, on March 4th, 2016, for 80 seconds?

25  A.  Okay, yes.

1  Q.  Do you recall what you discussed with him in that

2  call?

3  A.  No.

4  Q.  Okay.  Do you have any recollection of ever

5  discussing with the defendant the deletion of files from

6  the Dropbox account?

7  A.  No.

8  Q.  Between the time that you were served with the grand

9  jury subpoena, in early March of 2016, did you have

10  occasion to log into the Dropbox account?

11  A.  Yes.

12  Q.  And what if anything did you see?

13  A.  Well I don't know at what point it happened, but one

14  time when I logged in it was just gone, all the files

15  were gone.

16  Q.  And prior to that?

17  A.  They had all been there, um, unchanged.

18  Q.  All right.  And when in relation to the March 6th --

19  the March 2016 meeting in Boston did you notice this?

20  A.  Just before, um, within a week maybe.

21  Q.  Okay.  And, um, did you in fact have a meeting with

22  prosecutors in March of 2016?

23  A.  Yeah.  Yes.

24  Q.  Okay.  Did you tell anyone about what you had

25  noticed about the files disappearing?

1    A.   Yes.

2    Q.   Who did you tell?

3    A.   Um, I told my attorney.

4    Q.   Okay.

5    A.   And then I think I discussed it with the agents.   I

6    don't recall.

7    Q.   Okay.   As you sit here today, do you have a memory

8    of disclosing to the government that you had noticed

9    these files were missing?

10   A.   I think I did.

11   Q.   Um, do you know how those files disappeared?

12   A.   No.

13   Q.   Did you delete any of those files from the Dropbox

14   account?

15   A.   No.

16   Q.   Do you have any information as to who deleted them?

17   A.   No.

18   Q.   Was there previously -- and I say previously when

19   you had logged in and noticed the files were there, was

20   there previously a folder in Dropbox for Able Direct

21   Marketing?

22   A.   Yes.

23   Q.   Do you recall what that electronic folder was

24   called?

25   A.   I think it was just "Able."

1    Q.  Okay.  Is it possible it was "Able Direct

2    Marketing"?

3    A.  Of course it's possible, but I think it was just

4    "Able."

5    Q.  And when you checked most recently, was there still

6    a file for Able Direct Marketing?

7    A.  No.

8    Q.  Was there previously a folder for Annahuac

9    Management?

10   A.  Yes.

11   Q.  And do you recall what that folder was called?

12   A.  It was "Annahuac MGMT," I think.

13   Q.  Okay.  And when you checked most recently, was there

14   still a folder for Annahuac?

15   A.  No.

16   Q.  Was there previously a folder for Bioclean Products?

17   A.  Yes.

18   Q.  And do you remember what that was called?

19   A.  "Bioclean."

20   Q.  And when you checked most recently, did you see a

21   Bioclean folder?

22   A.  No.

23   Q.  Was there previously a folder for Coolserve?

24   A.  Yes.

25   Q.  Do you remember what you called that one?

1    A.   "Coolserve."

2    Q.   Is it possible you called it just "Cool"?

3    A.   Yes, it's possible.

4    Q.   Okay.  When you checked most recently, was there a

5    Coolserve folder?

6    A.   No.

7    Q.   Was there previously a folder for Esthetics World?

8    A.   Yes.

9    Q.   Okay.  Do you remember what -- did you have a short,

10   um, name for it?

11   A.   "E-World."

12   Q.   "E-World."  Okay.  And when you checked most

13   recently, was there still a folder for E-World?

14   A.   No.

15   Q.   Okay.  And was there previously a folder for Crown

16   Marketing?

17   A.   Yes.

18   Q.   And when you checked most recently, was there still

19   a folder for Crown Marketing?

20   A.   No.

21   Q.   Okay.  Do you recall offhand whether you had a

22   separate folder for Greenway Technology or whether that

23   was part of another folder?

24   A.   I believe that was part of another folder.

25   Q.   Are you familiar with something called "Target

1    Views"?

2    A.  Yes.

3    Q.  Okay.  And what if anything did the Greenway

4    Technology files have to do with Target Views?

5    A.  I don't know.

6    Q.  Okay.  And when you checked most recently, was there

7    anything for Greenway Technology in this file?

8    A.  No.

9    Q.  Was there previously a folder for Green 4 Green?

10   A.  Yes.

11   Q.  And when you checked most recently?

12   A.  No.

13   Q.  Was there previously a folder for Sheridan Clearing?

14   A.  Yes.

15   Q.  And when you checked most recently?

16   A.  No.

17   Q.  Okay.

18           MR. HERBERT:  Could we just have one moment,

19   um, I'm nearly finished, but we just need to pull up a

20   document separately.  I just want you to take a look at

21   what's been marked as Exhibit HQ for identification.

22           THE COURT:  And, Mr. Herbert, you have in mind

23   our discussion during the break.

24       HQ?

25           MR. HERBERT:  Yes, your Honor.

```
 1                    (On screen.)
 2    Q.  All right.  Ms. Peterson, could you just take a look
 3    at this spreadsheet that's in front of you.
 4    A.  Uh-huh.
 5    Q.  And tell me if you recognize the file structure of
 6    the files listed in this spreadsheet?
 7    A.  Yes, starting from the client name.
 8    Q.  Uh-huh.
 9    A.  Like on Row 33, "Shika," our file would start with
10    Shika.  And then Form 10 would be another folder.
11    Q.  Okay.  And what do you recognize that file structure
12    to be?
13    A.  That's how we organized our files.
14    Q.  Okay.  And what if any involvement did you have in
15    creating the path names depicted in this spreadsheet?
16    A.  Well they were kind of a uniform, so we would start
17    with the client name and then if there wasn't a folder
18    there that needed like letters, I created a letter.
19              THE COURT:  When you say "We," to whom are you
20    referring?
21              THE WITNESS:  To "we," sorry, Jehu and myself.
22    Q.  All right.  Well who would decide what to call it in
23    an electronic file in the folder?
24    A.  Well I guess Jehu would have the original folders
25    there and then the files would depend upon what, you
```

1 know, kind of file it was.  So if one was 10Q, it would

2 get a Form 10Q with the date.

3 Q.  Okay.  All right.  And what if any relationship was

4 there between, um, or is there between the path and file

5 names you see in Exhibit HQ and the Dropbox files?

6 A.  Well they're similar after the client.  I mean they

7 were still filed in the same way.  So we would start

8 with "Shika."

9 Q.  Okay.

10    MR. HERBERT:  Can I just have one moment, your

11 Honor?

12    (Pause.)

13 Q.  Now, Ms. Peterson, when you noticed the files

14 missing from the Dropbox file, um, were literally all of

15 the files gone or were any remaining?

16 A.  There were some files there, maybe, um, 15 to 20 --

17 well folders that I saw.

18 Q.  Okay.

19 A.  Where before there were hundreds.

20 Q.  Okay.  And do you know what the remaining folders

21 related to?

22 A.  I think they were just his personal stuff.

23 Q.  Okay.

24    MR. HERBERT:  No further questions for this

25 witness.

1          THE COURT:  Mr. Iredale, any questions for

2     this witness?

3          MR. IREDALE:  Yes, your Honor.

4          THE COURT:  You may.

5

6     CROSS-EXAMINATION BY MR. IREDALE:

7     Q.  Ms. Peterson, you have worked for Mr. Hand for about

8     25 years?

9     A.  Yes.

10    Q.  I'd like to review, if I could, the time periods and

11    some of the information that you shared with us.

12          MR. IREDALE:  Could we show the witness

13    Exhibit WR.

14          (On witness screen.)

15    Q.  Is this a resume that you prepared for yourself?

16    A.  Yes.

17    Q.  And because you were preparing a resume, you were

18    able to check the time periods to make sure they were

19    accurate?

20    A.  Yeah.

21    Q.  And is everything on the resume true and correct?

22    A.  It appears to be, yeah.

23    Q.  All right.

24          MR. IREDALE:  I move 616 into evidence, your

25    Honor.

1          MR. HERBERT:  No objection.

2          THE COURT:  No objection.  616 is in evidence.

3          (Exhibit 616, marked.)

4    Q.  Now let's talk, if we could, about where you first

5    met Mr. Hand.  It was at Day Campbell & Hand in Cosa

6    Mesa?

7    A.  It was called "Day & Associates," but it turned to

8    "Day Campbell & Hand," yes.

9    Q.  He was an associate when you first met him?

10   A.  Yes.

11   Q.  An "associate" means he was a lawyer who was not a

12   partner in the firm that was doing work?

13   A.  Yes.

14   Q.  Now, in addition you've known Jehu and have

15   interacted with him for some 25 years --

16   A.  Yes.

17   Q.  -- during the time you worked for him and with him?

18   A.  Yes.

19   Q.  And during that 25 years, have you ever had a normal

20   conversation with him?

21          MR. HERBERT:  Objection.

22          THE COURT:  Well I'll sustain it only because

23   I don't understand the question.

24          MR. IREDALE:  Yes.

25   Q.  Is it fair to say that Mr. Hand's style of

1    communication is unlike anyone else you've known?

2    A.   Yes.

3    Q.   Describe it to us?

4    A.   Um, he's a man of very few words.  He's, um -- he

5    doesn't -- he has a tendency to give you straight facts

6    and nothing else.

7    Q.   Now you were asked a question about the tone of

8    voice Mr. Hand had when you told him that you had been

9    approached by FBI agents in December of 2015?

10   A.   Okay.

11   Q.   Do you recall that question?

12   A.   Yes.  Yes.

13   Q.   And the prosecutor asked you, "Well, what was his

14   tone of voice?"

15   A.   Uh-huh.

16   Q.   And your answer was it was the same as it always is?

17   A.   Yeah, the same.

18   Q.   Was that true?

19   A.   Yeah.

20   Q.   Have you ever heard Jehu raise his voice up in

21   excitement or lower it in sadness?

22   A.   In anger, um, maybe two or three times.

23   Q.   In 25 years?

24   A.   In 25 years.

25   Q.   Have you seen him in social situations and the way

1    he relates generally to other people?

2              MR. HERBERT:  Objection, your Honor.

3              THE COURT:  Overruled.  He may have a few

4    questions.

5              MR. IREDALE:  Thank you, your Honor.

6    A.  Yes, on a few occasions.

7    Q.  Did you tell these prosecutors that to your mind

8    Jehu had Asperger's based on your personal observations

9    of the way he relates to other people?

10             MR. HERBERT:  Objection.

11             THE COURT:  Well I'm going to sustain that.

12             MR. IREDALE:  Well let me reframe it then,

13   with the Court's permission.

14   Q.  Would you describe Jehu in social situations and

15   whether he is awkward or at ease?

16   A.  Pick one of those two?

17             THE COURT:  Well what's your description of

18   his social interaction?

19             THE WITNESS:  He's not social.  He's very

20   reserved.

21   Q.  He's very reserved.  A few words.  Very reserved.

22        How about his work habits, could you describe

23   them?

24   A.  Um, he does nothing else but work.

25   Q.  Now you've seen his brothers on occasion, Adam Hand,

1    I believe at one point in 2010 or 2011, at a small area

2    in the office that he used?

3    A.   Yes.

4    Q.   And Jeremiah Hand, you've met him on occasion, I

5    believe?

6    A.   Yes.

7    Q.   Is it -- well to your mind is Jehu close to his

8    brothers?

9    A.   For Jehu he's close.

10   Q.   What do you mean by that?

11   A.   I don't think that's a -- a normal person wouldn't

12   think they're close.

13   Q.   (Pause.)  At one point Jehu worked for Laser Medical

14   Technologies in San Clemente?

15   A.   Yes.

16   Q.   And would you tell us what work he did during that

17   time?

18   A.   He was their in-house counsel.

19   Q.   And you worked with him and for him at that time?

20   A.   Yes.

21   Q.   And then he left that job after a little more than a

22   year and started his own solo practice?

23   A.   Yes.

24   Q.   And you described to us the locations where you had

25   the offices?

1   A.   Yes.

2   Q.   At one point?

3   A.   A couple of them, yes.

4   Q.   Yes.  At one point I think you had an office in a

5   condominium?

6   A.   Yes.

7   Q.   And at another point you said that you rented an

8   office near a boat yard?

9   A.   Yes.

10  Q.   In Dana Point?

11  A.   Yes.

12  Q.   And let me ask, if I might, um, at one point did

13  Jehu tell you that he was burned out and wanted to

14  retire?

15  A.   Yes, I heard that many times.

16  Q.   I'm sorry?

17  A.   I heard that many times.

18  Q.   And when he told you that, can you tell us about

19  what time period it was, what year, 2008, '9, '10,'12,

20  can you give an estimate?

21  A.   I don't know because he did say for years that he

22  wanted to retire.  But I couldn't guess when that was.

23  Q.   Now at some point you told us he did stop working

24  full-time and moved out of the country?

25  A.   Right.

```
 1   Q.  And that was, I believe you said, in the middle of
 2   20 --
 3   A.  July 2012.
 4            MR. HERBERT:  Your Honor, I object and move to
 5   strike based on the "stop working" part.  It's a
 6   mischaracterization.
 7            THE COURT:  Well the witness has answered.  I
 8   think it's about time we get to this case.
 9        Go ahead.
10   Q.  Well, my question is, did you testify before the
11   grand jury that Jehu retired in June of 2012 or
12   thereabouts?
13   A.  Yes.
14   Q.  Was that true?
15   A.  Well he closed his offices here and moved away.
16   Q.  All right.  And in fairness he continued to do some
17   work?
18   A.  Correct.
19   Q.  And you continued to work part-time thereafter, is
20   that fair to say?
21   A.  Correct, yes.
22   Q.  How many hours on average a month did you work in
23   the year 2012 after Jehu left the United States in June
24   of 2012?
25   A.  A month, um, maybe two hours a day.  So about -- 2
```

1    times 5 -- 40 hours.

2    Q.  40 hours a month, about 10 hours a week?

3    A.  Yeah.

4    Q.  You communicated by way of phone from time to time,

5    I take it?

6    A.  Yeah, e-mail or phone.

7    Q.  Now you understood Jehu was living in Antigua at

8    that time?

9    A.  Yes.

10   Q.  And at some point, I believe, did you understand

11   that he stayed with his daughter Maria at a small island

12   --

13   A.  Yes.

14   Q.  Called "Rowayton"?

15   A.  Okay.

16   Q.  Off the coast of Honduras?

17   A.  Okay.  I don't know.

18           THE COURT:  Well the testimony is she doesn't

19   know.

20           MR. IREDALE:  Okay.

21           THE COURT:  That's the testimony.

22           MR. IREDALE:  Fair enough.

23   Q.  Let me ask if at some point you became aware that he

24   was attending law school?

25   A.  Um, yes, I remember that.

1   Q.  And I believe that you wired the payment to the law

2   school in Nassau, Bahamas?

3   A.  Okay.

4   Q.  Do you remember that?

5   A.  I could have done that, yes.  I would have been the

6   one to do that.

7   Q.  Let me jump out of sequence for a moment and just go

8   back to that conversation you told us about in December

9   of 2016, some FBI agents had come to your house as I

10  understand?

11  A.  Yes, in 2015.

12  Q.  In 2015?

13  A.  Yes.

14  Q.  In 2015, forgive me, in 2015.  FBI agents had come

15  to your house.  And you live in San Clemente,

16  California?

17  A.  Yes.

18  Q.  Could you tell us what time of day you recall seeing

19  the FBI agents?

20  A.  It was early morning, like 7:00 in the morning.

21  Q.  They introduced themselves as FBI agents?

22  A.  Yes.

23  Q.  Would you describe the encounter as you recall?

24  A.  Um, I was getting in my car and he -- one of them

25  approached me and said that his partner was behind him

1   by a couple of minutes and could I wait?  And within

2   moments she pulled up.  And we went inside to talk.

3   Q.  You were given a subpoena?

4   A.  Yes.

5   Q.  Did you notice anything about the date on the

6   subpoena, that the date on the subpoena had already

7   passed?

8   A.  Yes.

9   Q.  So did you ask them how you were supposed to appear

10  at a date sometime before the date that they actually

11  gave you the subpoena?

12  A.  Right, I don't know at what point I noticed the date

13  had already passed, but when I did notice, I either

14  asked them or I asked my attorney.  I don't recall.

15  Q.  All right.  Now, what you said to your attorney, I

16  don't want to inquire about and I'm not asking, but do

17  you recall that one of them said at some point, "Well

18  this subpoena is still good, you have to contact

19  somebody"?

20  A.  I do, yeah, so I must have discussed it with the

21  agents that day.

22  Q.  And you said thereafter you called Jehu?

23  A.  Yeah.

24  Q.  Would you tell us, as best as you recall, what you

25  said and what he said?

1    A.    Well that the FBI agents were just at my house and

2    "Why?"  "What am I supposed to do?"  And he advised me,

3    um, very calmly, as he always is, to get an attorney

4    and, um, you know to follow the subpoena.

5    Q.    He said to "follow the subpoena"?

6    A.    He didn't say those words, but he said "Comply."  He

7    did say "Comply."

8    Q.    So he told you to comply with the subpoena?

9    A.    Yeah.

10   Q.    And did he say anything else other than that you

11   should get an attorney and comply with the subpoena?

12   A.    Not that I recall.

13   Q.    Did he at any point ask you to hide any files or

14   documents?

15   A.    No.  Never.

16   Q.    Did he ever ask you to destroy records?

17   A.    No.  Never.

18   Q.    Did he ever, after that point, give you any legal

19   advice other than to speak with an attorney?

20   A.    No.

21   Q.    Did he ever tell you what to say to the federal

22   grand jury?

23   A.    No.

24   Q.    Or to say if you were interviewed by government

25   agents or federal prosecutors?

1   A.   No.

2   Q.   Did he, to your mind, in any way attempt to

3   influence you to say anything other than the absolute

4   truth as best as you remember?

5   A.   No.

6   Q.   Have you told us the truth today in court?

7   A.   Yes.

8   Q.   And you testified under a grant of immunity before

9   the federal grand jury?

10  A.   Yes.

11  Q.   And in that regard did you tell the truth to every

12  question when you were testifying before the federal

13  grand jury?

14  A.   Yes.

15  Q.   All right.  Did you, to your mind, feel that you did

16  anything criminal, illegal, or wrong, during the time

17  you worked for Jehu?

18  A.   Yes, I shouldn't have signed those names.

19          MR. IREDALE:   Let's go if we could to --

20  Q.   You were asked to see an exhibit that's 144, it was

21  put by a letter, but I'm going to ask you to look at it

22  and tell us if Exhibit 144 represents an e-mail that

23  your attorney sent to you?

24  A.   (Looks.)  Yes.

25  Q.   And let's read that e-mail that counsel asked you to

1    review.

2         Your attorney's name is David Wiechert?

3    A.   Yes.

4    Q.   He's a lawyer in San Clemente, is he not?

5    A.   Yes.

6    Q.   This is dated the 2nd the March.  "Kim, I just

7    received a call from the lead prosecutor in Boston on

8    Jehu's case.  They are going back to the grand jury to

9    seek an indictment regarding Jehu's dealings in Crown

10   Marketing.  They view you as someone who knew or should

11   have known that there was wrongdoing afoot, but are not

12   committed to indicting you.  They would like you to come

13   to Boston pursuant to a proffer agreement that would

14   limit the government's use of their statements.  I

15   suggested a video-conference call to keep costs down,

16   but they want to do the interview in person."  Let me

17   stop there and just ask you a question.

18        This "proffer agreement," did you understand what

19   that meant when you read it?

20   A.   I was told it meant, you know, like immunity, so,

21   um, just speak.

22   Q.   "I suggested a video conference to keep costs down,

23   but they want to do the interview in person.  Proffer

24   sessions are not recorded."  We'll stop there.

25        Did you speak with prosecutors here in Boston?

1  A.  Yes.

2  Q.  Was there in fact any tape recording or any

3  preservation of what was said by them or said by you

4  during that interview to your knowledge?

5  A.  Not that I know of.

6  Q.  "So there will be an FBI agent or two taking notes.

7  Normally I would have an associate with me taking notes

8  so if there's a difference of opinion as to what you

9  said at a later date, there would be a way to fact-check

10  the agent's recitation.  To fly two lawyers to Boston

11  would not be cheap.  Just for me, between airfare, half

12  time for travel hours and a full-day meeting, the cost

13  would be around $10,000."  Can we stop there.

14      That's a lot of money?

15  A.  Yes, it is.

16  Q.  For you or for anybody?

17  A.  Yes.

18  Q.  "If you can get reimbursed, then my recommendation

19  would be to have me and Jess go.  If money is an issue,

20  then it would be you and me.  Under either scenario,

21  given what the prosecutor said on the phone, my gut is

22  that if you don't go, it is more likely than not you

23  will be a defendant in the superseding indictment.

24  Please call with any questions.  Thanks, Dave."  And we

25  can stop there.

1          Your attorney, to your knowledge, turned this over

2     to the government?

3     A.   Yes.

4     Q.   And you agreed to let him turn that over?

5     A.   He didn't ask me.

6     Q.   He just did it?

7     A.   I guess so.

8     Q.   And so after you read this, you understood that you

9     might end up being in a seat that is not a very pleasant

10    seat to sit in, a defendant's seat in a federal criminal

11    case?

12    A.   Yes.

13    Q.   You did not want that to happen?

14    A.   Of course not.

15    Q.   And so you and your attorney came to Boston and

16    spoke with prosecutors on the 16th of March or

17    thereabouts?

18    A.   Yes.

19    Q.   Then you returned in April, April of the year 2016,

20    and had another session from which you spoke to the

21    government?

22    A.   Yeah, I think so.

23    Q.   Now, the prosecutor, at that time who was the

24    regular Assistant U.S. Attorney, was not the

25    good-looking gentleman who asked you questions, but

1   another man named Vassili Thomadakis, correct?

2   A.  Yeah.

3   Q.  And could you tell us the general demeanor

4   Mr. Thomadakis adopted toward you in the interview in

5   April?

6   A.  He was business friendly.

7   Q.  He called you before the grand jury as a witness?

8   A.  He did.

9   Q.  And you testified?

10  A.  I did.

11  Q.  And you've come back here as a result of your

12  agreement to testify when required?

13  A.  Yes.

14  Q.  (Pause.)  Let me talk to you about the way in which

15  you communicated with Jehu after he left in June of

16  2012.

17  A.  Okay.

18  Q.  He was --

19              (Interruption.)

20              THE COURT:  No, go ahead.

21  Q.  He was able to e-mail you and speak with you by

22  phone?

23  A.  Sure.

24  Q.  Could you tell me the frequency of the phone contact

25  in the year 2012 after he left in June?

```
 1   A.  I couldn't guess, no.
 2   Q.  All right.
 3             THE COURT:  Yes, you can't guess.  And we're
 4   taking a 5-minute break, out and back.  Keep your minds
 5   suspended, do not discuss the case among yourselves nor
 6   with anyone else.  We'll stand in recess for 5 minutes.
 7             THE CLERK:  All rise for the jury.
 8             (Jury leaves, 12:30 p.m.)
 9             THE COURT:  And I'll see counsel at the
10   sidebar.
11
12             AT THE SIDEBAR
13             THE COURT:  How much longer do you have?
14             MR. IREDALE:  I estimated that the cross would
15   be about the length of the direct, so probably at this
16   point an hour and 45 minutes.
17             THE COURT:  And you're finishing Friday?
18             MR. PALID:  Not with that estimate.  Um --
19             THE COURT:  Well Melley's not going to be
20   long?
21             MR. PALID:  No, he's not.
22             THE COURT:  And so who is there?
23             MR. PALID:  All right, so Melley, half an
24   hour, 45 minutes.  Um, maybe I can do him in a half an
25   hour.  And Dropbox, um, probably half an hour.  And then
```

```
 1    we've got, um, two victims.  Um, if we have to cut one,
 2    we will cut one.
 3                THE COURT:  Well cut one -- well I can't say,
 4    but we're starting at 10:00 on Friday, so you'd be
 5    advised to do that.
 6                MR. PALID:  Yeah.
 7                THE COURT:  So we'll recess.
 8                MR. IREDALE:  And, your Honor, may I just ask
 9    on the, um -- assuming that we finish, we would have the
10    instruction conference then on Friday?
11                THE COURT:  Oh, yes.
12                MR. IREDALE:  Very good.
13                THE COURT:  So you get ready to argue on
14    Monday.
15                MR. IREDALE:  All right.  And I have to leave
16    this afternoon to fly across --
17                THE COURT:  Well we're doing it on Friday.
18                MR. IREDALE:  Thank you.
19                MR. PALID:  Thank you your Honor.
20                THE COURT:  All right, we'll recess briefly.
21
22                (In open court.)
23                (Recess, 12:35 p.m.)
24                (Resumed, 12:40 p.m.)
25                THE COURT:  Go ahead, Mr. Iredale.
```

1          MR. IREDALE:  Thank you, your Honor.

2     Q.  Ms. Peterson, let me just talk generally about what

3     you testified concerning the work that you did.

4          First, you said that you were largely involved in

5     typing?

6     A.  Yes.

7     Q.  Typing documents such as S-1s, which are

8     registration statements that are filed with the SEC?

9     A.  Yes.

10    Q.  And then quarterly reports or annual reports for

11    corporations?

12    A.  Yes.

13    Q.  And Jehu's work involved incorporating companies and

14    creating what you were calling "shells," correct?

15    A.  Correct.

16    Q.  And from time to time people would come, to your

17    knowledge, to him and try to get the company and use it

18    to develop a business?

19    A.  Yes.

20    Q.  That was what his work largely involved?

21    A.  Yes.

22    Q.  Incorporating a company, cleaning it up or clearing

23    it up, if necessary, and then letting another person use

24    that company for whatever purpose they desire, if they

25    purchase the company?

1    A.   Yes.

2    Q.   Is that fair to say?

3    A.   Yes.

4    Q.   So when you were telling us "shells," it sounded

5    like you were saying a bad word, "shell," "shell,"

6    "shell," did you mean anything --

7                MR. HERBERT:  Objection, your Honor.

8                THE COURT:  Yeah, the editorial comment is

9    stricken.

10               MR. IREDALE:  Forgive me.

11               THE COURT:  Now put the question.

12   Q.   Did you mean anything other than he incorporated a

13   company which was available for somebody to purchase or

14   use to do a business?

15   A.   Correct, yeah, we would incorporate the company and

16   I don't know where it went from there.  But it would

17   start as a nothing.

18   Q.   Fair enough.  My question, I guess, really is, um,

19   when you said the word "shell," did you mean to imply or

20   suggest that there was something illegal or wrong with

21   incorporating companies and holding them as shells for

22   people to purchase?

23   A.   No.  No.

24   Q.   Did you think that there was anything wrong with

25   that?

1    A.   No.

2    Q.   All right.  Now, you told us that in the work that

3    Jehu did, he would oftentimes use documents that he had

4    filed before as templates for later filings, is that

5    true?

6    A.   Yes.

7    Q.   So he would cross things out or change the things in

8    the basic form of the document and you would put in the

9    changes?

10   A.   Correct.

11   Q.   Now, you talked about doing what is called

12   "incorporation," um, "incorporating"?

13   A.   Yes.

14   Q.   And would you explain to us what that process

15   involves briefly, please?

16   A.   Um, submitting -- usually it's just a one piece of

17   paper, articles of incorporation, with a company name,

18   an address, a resident agent, and a signature, and then

19   you'd just ship it off to the agent of that state.

20   Q.   And you said that oftentimes you would use the state

21   of Wyoming in which to incorporate companies?

22   A.   Yes.

23   Q.   And was that for some reason having to do with

24   favorable laws in Wyoming for incorporation?

25   A.   I don't know.

1    Q.   If you know.

2    A.   I don't know.

3    Q.   Did you yourself also serve as the incorporator of

4    certain companies?

5    A.   Probably.

6    Q.   And now you said you were listed as the "President"

7    on some corporations?

8    A.   Yes, I think so.

9    Q.   And did you do that in effect to serve as a

10   placeholder under the company was sold and the person

11   who purchased the company would then put in the office

12   holder?

13   A.   Yes, right.  Yes.

14   Q.   And to your knowledge is that a common practice with

15   respect to newly-formed corporations?

16   A.   I don't know if it's a common practice, but it's

17   what we always did.

18   Q.   Now I need to talk to you about the date of April

19   the 3rd of the year 2012.

20   A.   Okay.

21   Q.   You remember April 3rd was the date on one of the

22   e-mails that government counsel was asking you about,

23   April 3rd of 2016?

24   A.   2016?  Not --

25   Q.   I'm sorry, April 3rd of 2012?

1    A.  Um, I don't know.

2    Q.  Well do you remember Jehu being out of the office on

3    April 3rd of 2012?

4    A.  I don't know.

5    Q.  Do you remember an incident in which Natalia was

6    arrested for punching him in the head?

7    A.  I remember an incident that she was arrested.  I

8    don't know the circumstances.

9    Q.  Do you remember that the date of her court

10   appearance was the 3rd of April, 2012?

11   A.  No.  No.

12   Q.  Jehu's daughter is named Maria?

13   A.  One of them, yes.

14   Q.  Maria was the young girl that you --

15   A.  The baby, yes.

16   Q.  -- went to pick up in Antigua?

17   A.  Yes.

18   Q.  Jehu, you found out, was arrested coming into Miami

19   in 2015?

20   A.  Yes.

21   Q.  And he called you and asked if you would please go

22   to Antigua and bring back his daughter, Maria?

23   A.  Yes.

24   Q.  And you did that for him?

25   A.  Yes.

1    Q.   (Pause.)  You were asked a series of questions about

2    various people and what you knew about them.

3    A.   Yes.

4    Q.   Including Yuri Semenov, Alexander Sosnovsky, you

5    remember that?

6    A.   Yes.

7    Q.   Karen Campo Nuriega?

8    A.   Yes.

9    Q.   Doris Urueta Turo?

10   A.   Yes.

11   Q.   Igor Produn?

12   A.   Yes.

13   Q.   And Mr. Semenov?

14   A.   Yes.

15   Q.   All right.  Now some of those people you met in

16   person and some of them you did not, is that fair to

17   say?

18   A.   Yes.

19   Q.   Let me, if I could, ask you to look at Exhibit WE.

20            MR. IREDALE:  And this is for the witness.

21            (On witness screen.)

22   Q.   Do you recognize the person --

23   A.   That's Yuri in the middle.

24   Q.   Yuri Semenov?

25   A.   Yes.

1                    MR. IREDALE:  Let's go to WF.

2                    (On screen.)

3    Q.  Do you recognize one of the two people there?

4    A.  Yuri, on the right.

5                    MR. IREDALE:  WG.

6                    (On screen.)

7    A.  Yuri.

8                    MR. IREDALE:  WH.

9                    (On screen.)

10   A.  It's Yuri on the left.

11                   MR. IREDALE:  WJ.

12                   (On screen.)

13   A.  Yeah, Yuri in the middle.

14   Q.  All right.  Now, in this photograph do you see the

15   person on the far right?

16   A.  Yes.

17   Q.  Do you recognize that as a person that you met once

18   before?

19   A.  No.

20   Q.  Let me show you WK and ask the same question.

21                   MR. IREDALE:  This is a single photo.

22                   (On screen.)

23   Q.  Do you recognize that person?

24   A.  No.

25   Q.  All right.

1           MR. IREDALE:  Your Honor, I would move into

2    evidence the first four photographs which the witness

3    testified about.

4           MR. HERBERT:  I object, your Honor.

5           THE COURT:  May I see them?

6           MR. IREDALE:  Yes, your Honor.

7           (Hands up.)

8           THE COURT:  No, they're excluded.

9    Q.  You met Yuri Semenov when you went to the Ukraine in

10   2005 or 2006?

11   A.  Whenever the wedding was, yes.

12   Q.  And he picked you up at the airport?

13   A.  He did.

14   Q.  Now did he have a tax driver's uniform on or did he

15   just pick you up?

16   A.  No, he just picked us up.

17   Q.  You understand him to be a businessman, not a taxi

18   driver?

19   A.  Yes.

20   Q.  And you know that he works for Norweigian Airlines

21   and has 150 people working under him?

22   A.  No.

23   Q.  When you met him, in any event, at one occasion he

24   went to a bank to open the account about which you

25   testified?

1   A.   Yes.

2   Q.   With you?

3   A.   Yes, he came here.  Yes.

4   Q.   And he's a signatory on that account?

5   A.   Yes.

6   Q.   You recognize his signature because you've seen him

7   sign documents and you've seen his signature many times

8   thereafter?

9   A.   Yes.

10  Q.   Now, is it fair to say that you do not know Jehu's

11  arrangements or business dealings with Yuri Semenov?

12  A.   Yes.

13  Q.   Jehu doesn't talk to a lot of people and if he talks

14  to a lot of people it's about what's at issue, correct?

15  A.   Yes.

16  Q.   So you don't know exactly what business projects

17  he's involved with with Yuri, is that true?

18  A.   True.

19  Q.   Alex Sosnovsky, you don't remember meeting him in

20  any event?

21  A.   No.

22  Q.   And Jehu did not share with you any of the business

23  dealings that he had with Mr. Sosnovsky?

24  A.   No.

25  Q.   Igor Produn.  When Jehu was married in the Ukraine

1   in 2005 or 2006, do you remember there were a lot of

2   people there?

3   A.  Yeah.

4   Q.  You don't remember meeting a man named "Igor" at any

5   time?

6   A.  No.  I could have, but, no, I don't.

7   Q.  Well there may have been more than one Igor there as

8   well?

9   A.  True.

10  Q.  But you don't know what dealings or business he has

11  with Mr. Produn?

12  A.  No.

13  Q.  Or what projects they're involved in?

14  A.  No.

15  Q.  You talked about Doris Urueta Turo?

16  A.  Yes.

17  Q.  Is it fair to say to say that Jehu sent her money

18  from time to time?

19  A.  Yes.

20  Q.  And you understand that he has a child by her?

21  A.  Um, I -- it's possible.

22  Q.  And did he send regular support payments, if you

23  know?

24  A.  He sent money to her regularly.

25  Q.  Fair enough.  But you didn't know whether it was for

1    support or for anything else?

2    A.  No.

3    Q.  As to whether he had conversations with her about

4    business investments for her or with her, you don't

5    know?

6    A.  No, I don't.

7    Q.  All right.  Karen Campo Capo Noriega, the same would

8    be true?

9    A.  The same.

10   Q.  Is that fair?

11   A.  Yes, the same.

12   Q.  William Wilkinson.  You have received e-mail from

13   Mr. Wilkinson in the past?

14   A.  I think I have.

15   Q.  (Pause.)  Well let me, if I could, ask you if from

16   time to time you would do transactions involving

17   Jeremiah Hand?

18   A.  What do you mean by "transactions"?

19   Q.  Well, in other words, do you recall on one

20   occasion -- well let me see if I can help.

21            MR. IREDALE:  May I have just one moment,

22   please, your Honor?

23            THE COURT:  You may.

24            (Pause.)

25            MR. IREDALE:  Let me show you Exhibit 478,

1    please.  (On screen.)  Can we just enlarge that at the

2    top.  (Enlarged.)

3    Q.  This is from Learned Hand to

4    "kimberlysckimmie@cox.net," that was your e-mail

5    address?

6    A.  Yes.

7    Q.  Copy to jehu@jehu.com.  "Subject:  Wire help!"

8    Exclamation.  "Kim, help, I'm buying the marijuana

9    business, to do the deal I must wire 30,000 from Able

10   Direct Marketing.  You should be receiving the money

11   today from my Harrington Bank in North Carolina."  And

12   then there's some banking information and routing

13   information.

14        Do you see that?

15   A.  Yup.

16   Q.  And then there's something that says "Account name

17   Charles T. Houghton, Attorney Trust Account."  Do you

18   see that?

19   A.  Okay.  Yes.

20   Q.  Do you remember that at some point Learned Hand

21   called and spoke with you on that date?

22   A.  I don't remember him calling, but he probably did.

23   Q.  He says "Also, if the wire fees cut this amount down

24   by a bit, it is okay, it can be a little shy, and I

25   don't want this to cost Able the fees to send the wire."

1   Then he says, "I am on my cell phone," and he leaves a

2   number, 919-428-3600."

3          Do you see that?

4   A.  Yes.

5   Q.  And did you in fact help him with the transaction

6   that he asked for your help with?

7   A.  If the money came into Able direct?  Yes, I would

8   have turned it around and wired it out.

9              MR. IREDALE:  Let's go to Exhibit 479, please.

10             (On screen.)

11  Q.  All right.  This is a wire transfer bank record, do

12  you see?

13  A.  Yup, so 30,000 came in and then I wired it right

14  out.

15  Q.  All right.  So this shows an incoming amount of

16  $30,000 from the Harrington Bank FSB in Chapel Hill?

17  A.  Yes.

18  Q.  And you then wired it out to "Charles T. Houghton

19  Attorney Trust," is that right?

20  A.  Yes.  Yes.

21  Q.  So the money came into the account and then was

22  wired right out, is that fair to say?

23  A.  Yes.

24             MR. IREDALE:  Let's go to another exhibit,

25  481-R.

1          (On screen.)

2     Q.  This is a phone record.

3          MR. IREDALE:  481.  A phone record.  (On

4     screen.)  Could we -- could we blow up the highlighted

5     entry.  (Enlarged.)

6     Q.  All right.  So this shows that there was a call on

7     the 18th of April at 12:29 and it was to Chapel Hill,

8     North Carolina.

9          MR. IREDALE:  Could we see whose account it is

10    at the very top?

11          (Enlarged.)

12    A.  That's my account.

13    Q.  That's your account?

14    A.  Uh-huh.

15    Q.  All right.  Now it says "Kimberly Hand."  Was this

16    an attempt to disguise your identity?

17    A.  No, Jehu Hand owned a number before I moved it to my

18    personal account and they just transferred it.  I don't

19    know why the name says that.  An administrative error.

20    Q.  So the phone company just kept the last name?

21    A.  I assume so.  I don't know.

22    Q.  Do you remember speaking with a Jeremiah Hand about

23    a wire transfer that he wanted you to do that day?

24    A.  I don't recall the conversation, no.

25          MR. IREDALE:  Let's go to Exhibit 482-RN.  I'm

1    sorry, 482.  (On screen.)  Could we go to Bates Number

2    351.  (On screen.)

3    Q.  This is for Able Direct Marketing, 24 Calle de la

4    Luna, San Clemente, California?

5    A.  Okay.

6    Q.  It says "wire transfer activity"?

7    A.  Yes.

8    Q.  And it shows at the bottom an incoming wire transfer

9    credit to the Able Direct Marketing account?

10   A.  Yes.

11   Q.  For $7,550?

12   A.  Right.

13   Q.  And it comes from Harrington Bank in Chapel Hill?

14   A.  Yes.

15   Q.  And then it was immediately wired out to J & M

16   Group, Timonium, Maryland, do you see that?

17   A.  Yes.

18   Q.  Except it was $50 less because there was a wire

19   transfer cost, isn't that true?

20   A.  Yes.

21   Q.  Did Jeremiah Hand ask you to wire that money out for

22   him that day?  If you recall.

23   A.  I don't recall.  But most likely.

24   Q.  But that did not stay in the Able Direct Marketing

25   account, it went out to the J & M Group in Timonium,

1    Maryland?

2    A.  Yes.

3    Q.  If that's what the record reflects?

4    A.  Yeah.

5    Q.  You were the person involved in many of the wires, I

6    take it?

7    A.  All of them.

8    Q.  All of them?

9    A.  Yeah.

10   Q.  All right.

11            MR. IREDALE:  Let's go, if we could, to the

12   next page.  (On screen.)  Could we see an incoming wire

13   transfer credit, please.

14            (On screen.)

15   Q.  This shows $50,000 coming into the account from

16   Harrington Bank, Chapel Hill?

17   A.  Yup.

18   Q.  It says "Originator, Fortune Industries, Cheyenne,

19   Wyoming," do you see that at the bottom?

20   A.  Yup.

21   Q.  And then that same amount, that very same amount

22   went out to Emerging Media Group, LLC?

23   A.  Right.

24   Q.  Did Jeremiah Hand tell you to send that amount of

25   money out of the account to Emerging Media Market, LLC?

1    A.   Most likely.

2    Q.   And you did him that favor, is that fair to say?

3    A.   Yes.

4    Q.   (Pause.)  Now, may I ask, did Jehu Hand ever tell

5    you, "I want you to forge somebody's name"?

6    A.   In those words?  No.

7    Q.   He told you, um -- he told you, did he not, that he

8    wanted you to get the signatures of the people involved?

9    A.   Yes.

10   Q.   And on your own you chose to write the name of the

11   person?

12   A.   No.

13   Q.   Either Karen Campo or Doris Urueta?

14   A.   No.  The first time or two, um, he told me it needed

15   to be signed by whomever, Karen or Doris, and to just

16   write it.  After that it just followed suit, he didn't

17   ask, I just did it.  It was implied that Karen needs to

18   sign it.

19   Q.   That Karen needs to sign it?

20   A.   That this needs to be signed by Karen.

21   Q.   All right.

22             THE COURT:  This is a good time to stop?

23             MR. IREDALE:  It is a perfect time.  Thank

24   you, your Honor.

25             THE COURT:  Now, ladies and gentlemen, we're

```
 1    not sitting tomorrow.  We planned this going in.  One of

 2    the attorneys has to argue before a higher court

 3    tomorrow and I respect that, so we're planning not to

 4    sit.  They tell me we'll finish with the evidence on

 5    Friday and we're planning on giving you the case on

 6    Monday.  And so Monday, you have to plan to be available

 7    to stay with us all day, business hours, we'll give you

 8    lunch, cafeteria food, but that's the plan.

 9         On Friday -- again this is my responsibility given

10    my obligations, we don't start till 10:00 in the

11    morning.  You're so good on time, so I'll tell you, at

12    10:00 in the morning we'll start.  And that's Friday.

13         Keep your minds suspended.  You have not heard all

14    the evidence.  Do not discuss the case either among

15    yourselves nor with anyone else.  You may stand in

16    recess now until 10:00 on Friday the 18th.

17              THE CLERK:  All rise for the jury.

18              (Jury leaves, 1:00 p.m.)

19              MR. PALID:  Your Honor, we have a stipulation

20    that if possible we'd like you to read at the start of

21    evidence on Friday?

22              THE COURT:  If I remember it, I will do that.

23              MR. PALID:  Okay, thank you.

24              THE COURT:  But I will certainly read it.

25    Thank you.  Good luck, Mr. Iredale.  And we'll start at
```

```
 1    10:00 on Friday morning.  We'll recess.

 2               MR. IREDALE:  Thank you so much, your Honor.

 3               (Adjourned, 1:00 p.m.)

 4

 5                    C E R T I F I C A T E

 6

 7         I, RICHARD H. ROMANOW, OFFICIAL COURT REPORTER, do

 8    hereby certify that the forgoing transcript of the

 9    record is a true and accurate transcription of my

10    stenographic notes, before Judge William G. Young, on

11    Wednesday, May 16, 2018, to the best of my skill and

12    ability.

13

14

15
      /s/ Richard H. Romanow 08-05-19
16    _____
      RICHARD H. ROMANOW  Date
17

18

19

20

21

22

23

24

25
```